Stephen D. Finestone (125675)
Ryan A. Witthans (301432)
FINESTONE HAYES LLP
456 Montgomery Street, Suite 1300
San Francisco, CA 94104
Tel.:  (415) 481-5481
Fax:   (415) 398-2820
Email: sfinestone@fhlawllp.com
Email: rwitthans@fhlawllp.com

Counsel for Books Inc.,
Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| In re BOOKS INC.,<br><br>Debtor-in-Possession. | Case No. 25-40087-WJL<br>Chapter 11<br><br>**Declaration of Andrew Perham in Support of Debtor's Motions for Entry of Orders:**<br><br>**(1) Directing the United States Trustee to Appoint a Consumer Privacy Ombudsman;**<br><br>**(2) Authorizing Sale of Substantially All Assets Free and Clear of Liens, Claims, Interests, and Encumbrances;**<br><br>**(3) Authorizing Assumption, Assignment, and Novation of Certain Executory Contracts and Unexpired Leases;**<br><br>**(4) Approving Bidding Procedures and Break-Up Fee; and**<br><br>**(5) Granting Related Relief.**<br><br>Hearing:<br>Date:  September 24, 2025<br>Time:  10:30 a.m.<br>Place: United States Bankruptcy Court<br>         Courtroom 220<br>         1300 Clay Street<br>         Oakland, CA 94612<br>         *Also via Zoom videoconference.* |

PERHAM DECLARATION                                                                                                 1

I, Andrew Perham, declare as follows:

1. I am the chief executive officer of Books Inc. (the "Debtor"). I make this declaration in support of *Debtor's Motions for Entry of Orders: (1) Directing the United States Trustee to Appoint a Consumer Privacy Ombudsman; (2) Authorizing Sale of Substantially All Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; (3) Authorizing Assumption, Assignment, and Novation of Certain Executory Contracts and Unexpired Leases; (4) Approving Bidding Procedures and Break-Up Fee; and (5) Granting Related Relief* (collectively, the "Motion"). All capitalized terms used herein and not otherwise defined in this declaration will have the meanings set forth in the Motion.

2. All statements in this declaration are based on my own personal knowledge and observation, or upon information and belief based upon my review of the Debtor's business records in this case. If called to testify on this matter, I could and would competently testify to the matters set forth herein.

3. Since deciding to sell substantially all its assets, the Debtor has engaged in an extensive search for a buyer for the Debtor's business as a going concern. After receiving only a limited number of inquiries, the Debtor received a nonbinding offer from Barnes & Noble Booksellers, Inc. ("Barnes & Noble") to purchase the assets for $3.25 million pursuant to the terms of a letter of intent ("LOI"), dated July 7, 2025. The Debtor has received no other offers and only a limited number of inquiries, despite continued efforts to solicit other interested buyers. The proposed sale is subject to the Bidding Procedures and Break-Up Fee as set forth below, the terms of the Asset Purchase Agreement ("APA") and approval of this Court.

4. If the proposed sale is approved, I am informed and believe that it will pay the Debtor's secured, administrative, and priority claimants in full, and will provide for a meaningful distribution to unsecured creditors. Without Court approval of the proposed sale, the Debtor would likely need to shut its doors and begin a wind-down process, in which case the Debtor projects that its value would be entirely consumed by the Secured Creditors and other claimants would receive nothing.

PERHAM DECLARATION 2

Case: 25-40087   Doc# 88-5   Filed: 09/03/25   Entered: 09/03/25 15:12:12   Page 2 of 16

5. The Debtor is the oldest independently owned and operated bookstore in the western United States. Its origins date back to 1851 and it has operated under its current name since 1946. The Debtor presently operates ten brick-and-mortar retail locations in a variety of settings in the Bay Area, including retail shopping centers, street-level commercial corridors, and two locations at the San Francisco International Airport ("SFO Airport"). The Debtor runs an online storefront at www.booksinc.net and maintains a robust calendar of in-store and off-site author events, book clubs, and community engagement efforts. Approximately 95% of the Debtor's revenue is derived from traditional in-person retail sales, while events and online sales account for the remainder.

6. The Debtor's financial troubles can be traced to the COVID-19 pandemic, which caused a sharp decline in sales due to shelter-in-place orders and social distancing mandates. Although public health restrictions have ended, the pandemic triggered long-term changes in consumer behavior that reduced in-person sales. Many of the Debtor's locations have historically relied on foot traffic from office workers and commuters. The shopping patterns of these groups shifted significantly due to the widespread adoption of remote and hybrid work models, resulting in decreased foot traffic and revenue at many of the Debtor's retail stores.

7. The Debtor's intent when it filed for bankruptcy was to use the procedures afforded by the Bankruptcy Code to adjust its lease costs to align with the current levels of foot traffic and sales in neighborhoods where it operates. To that end, the Debtor has found success in negotiating with its landlords to reach favorable lease terms.

8. The Debtor's Secured Creditors are as follows, with amounts estimated based on the Debtor's schedules and creditors' proofs of claim:

| Creditor | Collateral | Amount |
| --- | --- | --- |
| Commercial Bank of California | First priority blanket lien on all assets. | $491,234.00 |
| U.S. Small Business Administration | Second priority blanket lien on all assets. | $506,935.38 |
| Adrienne Kernan | Third priority blanket lien on all assets. | $275,685.00 |
| Stephen Mayer | Fourth priority blanket lien on all assets. | $500,000.00 |
| | Total | $1,773,854.38 |

9. Aside from these four Secured Creditors, I neither know of nor suspect any claims or interests secured by the Debtor's assets. I note that, consistent with the orders authorizing its use of cash collateral, the Debtor has been making adequate protection payments to certain Secured Creditors, which I anticipate has reduced the amounts owed to those creditors.

10. I am informed and believe that, together, the Secured Creditors and DIP Lender hold claims totaling up to approximately $1,973,854.38. As set forth below, the purchase price of $3.25 million will pay these claims in full, even after accrued interest.

11. Despite the Debtor's progress in negotiating with its landlords, two setbacks arose. Both involved the Debtor's SFO Airport storefronts in Terminals 2 and 3, which have historically been the Debtor's top-performing locations. While the Debtor was aware of these developments ahead of time, the scale of their impact was much larger than anticipated.

12. First, American Airlines moved its flights to the newly renovated Terminal 1, causing sales at the Debtor's Terminal 2 store to suffer because of decreased passenger volume. Informed that Southwest Airlines would increase flights from Terminal 2, the Debtor based its sales projections, which I reviewed, on passenger volume projections provided by the SFO Airport and on the Debtor's historical sales-per-passenger metrics. However, both the passenger volume and sales per passenger have been far lower than expected.

13. Second, the airport began an extensive construction project in Terminal 3. Prior to construction, the Debtor's Terminal 3 store benefited from a prominent location that received plenty of foot traffic. Now, construction barriers have reduced the store's footprint and routed potential customers around the store.

14. The impact of these challenges has been significant. The sudden decline in sales at these SFO Airport locations, which have typically been the Debtor's highest earning stores, has severely constrained the Debtor's cash flow. Had the airport stores continued to perform at pre-disruption levels, I believe the Debtor would likely have been able to return to profitability by adjusting the lease terms at its other locations. Instead, the loss of revenue from the key SFO Airport locations has hamstrung the Debtor's reorganization efforts.

15. I am informed and believe that the Debtor does not have sufficient cash flow to continue operations for enough time to establish, solicit, and confirm a Chapter 11 plan. It is incurring monthly operating losses and faces a risk of insolvency if it cannot promptly pursue an alternative strategy. Without a reliable and near-term path to positive cash flow, and in consultation with its advisors, the Debtor determined that a sale of its business as a going concern would be the best available option to (1) pay its secured obligations, administrative expenses, and priority claims in full; (2) make a meaningful distribution to its general unsecured creditors; (3) manage the uncertainties inherent in continuing to operate its business in the present economic climate; and (4) ensure the continued operation of its existing storefronts, to the extent possible in light of the preceding points.

16. The Debtor has undertaken a broad marketing effort to maximize value for the estate. The Debtor identified and reached out to a deep pool of prospective purchasers, including competitors, strategic buyers, and investors. Beginning on or about March 2025, the Debtor reached out directly to known potential buyers and sought further leads through its extensive industry contacts. Five parties expressed interest. With the assistance of its advisors, the Debtor engaged these parties in discussions around process, timeline, diligence requests, and transaction terms. The Debtor's goal throughout this process was to ensure a competitive process capable of yielding the highest and best offer for the assets.

17. Only one prospective party, Barnes & Noble, emerged with serious interest and ability to purchase the Debtor's assets at a competitive price. The proposed Buyer, BI Acquisition Co. LLC, is a subsidiary of Barnes & Noble. Barnes & Noble first expressed interest early in the process and engaged in preliminary due diligence prior to Barnes & Noble's execution of the non-binding LOI on July 7, 2025, and it has continued extensive due diligence since then. The LOI outlined the general terms of the proposed transaction, which are described in detail below.

18. Following the LOI, the parties continued to engage in extensive due diligence. The Debtor has provided access to financial, operational, and legal information to facilitate

Barnes & Noble's evaluation of the proposed transaction. These negotiations culminated in the APA.

19. The proposed transaction is the result of good faith and arm's length negotiations, without any collusion or fraud of any kind. Neither the Buyer nor Barnes & Noble have any relationship or agreements with any other potential buyers. The Buyer has no prior relationship with the Debtor, its officers, directors, shareholders, or employees. Aside from hiring many of the Debtor's employees (and possibly one or more of its officers, as yet to be determined) on commercially reasonable terms and otherwise engaging with the Debtor's personnel to facilitate an orderly transition, Barnes & Noble and the Buyer do not anticipate having any ongoing relationship with the Debtor or its personnel following the sale. No insiders of the Debtor are receiving any payment from Barnes & Noble or the Buyer other than the possibility of post-closing employment on commercially reasonable terms, and no payments or benefits will be provided outside of standard employment compensation, if any. Apart from regular commercial relationships with certain book publishers and vendors that also supply inventory to the Debtor, neither Barnes & Noble nor the Buyer has any relationship with the Debtor's major creditors.

20. I am informed and believe that the Buyer has the necessary financial capacity to consummate the proposed transaction. I am further informed and believe that Barnes & Noble has demonstrated expertise in the acquisition of distressed local bookstores. I am informed and believe that, in mid-2024, Barnes & Noble (through a subsidiary) acquired substantially all the assets of an independent bookseller operating the Tattered Cover bookstore chain in Colorado out of its Chapter 11 bankruptcy case. I understand that Barnes & Noble kept the Tattered Cover name, branding, and most of its employees, and operates the stores in the spirit of their previous owner.

21. The Debtor proposes to sell, and the Buyer proposes to buy, substantially all of the assets of the Debtor pursuant to the APA. A true and correct copy of the APA is attached as **Exhibit A** to the Motion. The key terms of the proposed sale, as I understand them, are as follows:

a. **Purchased assets.** The "Purchased Assets" include substantially all assets of the Debtor, including, without limitation, all inventory of the Debtor worth an estimated $1.2 to $1.3 million. The Purchased Assets specifically exclude, among other things: (a) the Debtor's cash and bank accounts; (b) the lease of the Debtor's office/warehouse in San Leandro, California (the "San Leandro Storage Facility"), except that the Buyer shall have access to the San Leandro Storage Facility, as defined in the APA, for a period of two months after closing in exchange for payment of $25,000 per month, during which two-month period the Debtor will pay utilities and other costs associated with such facility; and (c) all claims arising under §§ 542 through 550.

b. **Purchase price.** The Buyer will pay $3.25 million (the "Purchase Price") in cash for the Purchased Assets, with $2.6 million paid upon closing and the remaining $650,000 as a holdback to secure any claims of the Buyer that may arise under the APA, including a final adjustment for inventory value. The Purchase Price will be adjusted down on a dollar-for-dollar basis if the inventory is worth less than $1.2 million, and up on a dollar-for-dollar basis if it is worth more than $1.3 million. The holdback, less any amounts required to satisfy claims of the Buyer, shall be released in two payments: (a) $325,000 will be released six months after closing; and (b) the balance will be released twelve months after closing.

c. **Assumed liabilities.** The APA provides for the Buyer's assumption of the following liabilities: (a) any claims and liabilities of the Debtor (excluding taxes) arising on account of the ownership and operation of the Purchased Assets after closing; (b) post-closing liabilities for all assumed, assigned, and/or novated leases; and (c) gift card and customer loyalty program liabilities. Note that the Buyer is not assuming the lease cure costs, which will be paid by the Debtor from the sale proceeds.

d. **Assumption, assignment, and novation of contracts and leases.** The Debtor will assume and assign to the Buyer or novate the Debtor's leases (with the exception of the San Leandro Storage Facility) and executory contracts, as specified by Buyer. Pursuant to Court order, the Debtor has already either entered into a new lease or assumed the leases listed on **Exhibit B** to the Motion. Those leases will be assigned or novated upon approval of the proposed sale. Other leases which the Debtor will assume and assign to Buyer or novate are listed on **Exhibit C** to the Motion. Further, the Buyer will make arrangements to provide a new bond for the SFO Airport leases and the $193,968 in cash that secures the existing bonds will be returned to the Debtor. All other security deposits, with an estimated value of $110,000, will be transferred to the Buyer, except that if the Buyer chooses not to assume a particular lease, the security deposit will remain with the Debtor. The Debtor will pay cure costs out of the sale proceeds at or shortly after closing. Cure costs are listed on **Exhibits B** and **C** to the Motion. The Debtor is unaware of any post-petition defaults, or resulting pecuniary losses, of any non-debtor parties other than as described above.

e. **Representations and warranties.** The parties agree to customary representations and warranties, with survival of such representations and warranties for twelve months after closing (to coincide with the final payment).

22. I have reviewed the lists of the Post-Petition and Previously Assumed Leases and the Remaining Leases attached to the Motion as **Exhibits B** and **C**. Based on my review, I am informed and believe that these exhibits accurately reflect the Debtor's books and records.

23. I am informed and believe that the proposed sale will pay the Debtor's secured, administrative, and priority claimants in full, and will provide for a meaningful distribution to unsecured creditors. The likely distribution of the sale proceeds, estimated to the best of my

ability based on my review of currently known information including the Debtor's schedules and creditor's proofs of claim, is as follows:

| Sale price | $3,250,000.00 |
|---|---|
| Less cure costs | -$82,462.39 |
| Less Secured Creditors | -$1,773,854.38 |
| Less DIP Lender[1] | -$200,000.00 |
| *Remaining* | *$1,193,683.23* |
| Less administrative claims[2] | -$125,000.00 |
| Less priority claims | -$746,979.85 |
| *Remaining* | *$321,703.38* |
| General unsecured claims | $4,738,440.78[3] |
| Percent distribution | 6.8% |

24. The proposed sale is anticipated to pay all secured, administrative, and priority claimants in full. Note that the projected 6.8% return to general unsecured creditors in the table above results solely from the Purchase Price received by the Debtor in the transaction. The total percent distribution to general unsecured creditors is anticipated to increase by approximately 5–8% (to a total 11.8–14.8%) as other sources of value are liquidated, including the Debtor's cash on hand and the return of the funds securing the SFO Airport leases to the Debtor, neither of which will be transferred to the Buyer in the proposed transaction. Furthermore, any successful objections to secured, administrative, and priority claims will further increase distributions to general unsecured creditors.

25. The Debtor considered alternatives to the proposed sale, including obtaining new financing and implementing cost-cutting measures to stabilize operations. However, none of these options offered a sustainable path forward. The Debtor projected that a significant infusion

---

[1] The Debtor secured post-petition financing in an amount up to $200,000 to ensure that it has funds to continue normal operations while the proposed transaction is finalized. *See* Docket Nos. 76, 81.

[2] Estimated to include approximately $100,000 due to bankruptcy counsel Finestone Hayes LLP and $25,000 to the United States Trustee.

[3] Includes $828,000 for estimated lease rejection claim, capped by § 502(b)(2), resulting from the rejection of the San Leandro Storage Facility lease.

PERHAM DECLARATION 9

of new funds would be required to sustain operations until conditions at the SFO Airport improved. The Debtor determined it could not secure sufficient funds on acceptable terms. Even if additional capital were available on acceptable terms, I am informed and believe that the Debtor's anticipated revenues would not support a feasible plan of reorganization with long-term viability. Further operational cuts would have undermined the Debtor's ability to serve its customers and generate revenue. Ultimately, the Debtor concluded that a sale of its business as a going concern would generate maximum value to repay creditors. Absent the proposed sale, the Debtor projects that it would need to shut its doors and begin a wind down process, in which case the value of the Debtor's inventory, which it estimates at $1.2 to $1.3 million, would likely be entirely consumed by the Secured Creditors.

26. The Debtor respectfully requests that the Court permit overbids to be made at or before the hearing on the Motion, subject to the condition that a break-up fee in the amount of $150,000 ("Break-Up Fee") is approved before any overbidding is permitted and subject to the procedures ("Bidding Procedures") set forth below. I am informed and believe that pursuant to the APA, if the Break-Up Fee and Bidding Procedures are not approved before any overbidding is permitted, then the Buyer will have the right to terminate the APA. Potential overbidders may submit their qualifications to the Debtor within two days of the hearing on the Motion.

27. The Debtor is not seeking separate approval of formal bidding procedures because, despite the Debtor's comprehensive marketing efforts, only one prospective buyer completed the due diligence process, negotiated a proposed transaction, and demonstrated the financial wherewithal to close the sale. Despite the Debtor's broad marketing and best efforts, no other parties expressed an interest in acquiring the assets on comparable terms. Moreover, it is critical that the sale close as soon as possible to minimize ongoing losses and preserve value for the estate and its creditors. As previously discussed, the Debtor's value is maximized by remaining as a going concern. If the Debtor is forced to liquidate, it estimates that its inventory would yield only approximately $1.2 million, the estate's value would be entirely consumed by the Secured Creditors, and other creditors would receive nothing.

28. The Debtor proposes that competing bids may be presented at the hearing on the Motion, subject to the Bidding Procedures set forth in the Motion and the accompanying MPA.

29. I have reviewed and am familiar with the Bidding Procedures and the Break-Up Fee, and I believe that they are in the best interests of the estate. I am informed and believe that the Break-Up Fee payment serves as a necessary incentive for the Buyer's participation and recognizes the Buyer's role in establishing a baseline offer for the Purchased Assets and in creating an additional opportunity for bidding. It further recognizes the risk inherent in expending significant resources conducting due diligence and negotiating the APA while the Debtor continued to shop Barnes & Noble's offer, all without prior assurance of a break-up fee, and reimburses the Buyer for the necessary service and benefits provided to the estate.

30. The proposed sale involves the transfer of personally identifiable information ("PII"). I understand that, consistent with the Debtor's privacy policy, PII will only be transferred with the consent of the Debtor's customers. The PII is collected when customers register on the Debtor's website, place an order, subscribe to a newsletter, respond to a survey, or fill out a form. The PII generally includes customer names, email addresses, mailing addresses, phone numbers, and credit card information. The Debtor has historically used this information to process customer orders and to circulate marketing newsletters to customers that have affirmatively opted in.

31. The Debtor's privacy policy provides, among other things, that customer information "will not be sold, exchanged, transferred, or given to any other company for any reason whatsoever, without your consent, other than for the express purpose of delivering the purchased product or service requested." A copy of the Debtor's privacy policy, which remained in effect on the petition date, is attached as **Exhibit A** to this declaration. I am informed and believe that the Debtor will transfer PII to the Buyer with all required consents. Therefore, I am informed and believe that the transfer will be consistent with the Debtor's privacy policy. I further believe and will work with the CPO to establish that the transfer of PII is consistent with applicable non-bankruptcy law.

32. I am informed and believe that appointing a CPO is both appropriate and prudent in this case. The proposed sale involves the transfer of PII as defined by the Bankruptcy Code. While I believe the transfer will comply with its privacy policy and applicable law, a CPO will provide an added layer of protection for customer privacy, the Debtor, and the Buyer. I understand that the CPO will review the privacy policies of both parties, assess the privacy implications of the transfer, and assist the Court in determining whether the sale of PII aligns with the Debtor's policy and applicable law. I believe that this approach is consistent with recent bankruptcy practice and ensures that the interests of all stakeholders—including customers, the Debtor, and the Buyer—are protected.

33. I am informed and believe that the proposed transaction should be approved. As set forth above, the Debtor does not have projected cash flow to sustain operations through plan confirmation. It is the Debtor's business judgment, in consultation with advisors, that the best way to maximize the value of the bankruptcy estate is the prompt sale of substantially all of its assets. The marketing and sale efforts undertaken by the Debtor were designed to ensure that the highest and best price was obtained for the assets in order to maintain the business as a going concern. Barnes & Noble is an experienced and capable company, and the Debtor believes that it is obtaining the maximum possible value for its assets. As an assurance of maximizing value, the transaction will be tested through the ability for qualified Prospective Bidders to submit competing overbids at or before the hearing on the Motion subject to the Bidding Procedures.

34. The Debtor further seeks authorization, but not direction, to pay the claims of the Secured Creditors and the DIP Lender directly from the sale proceeds upon closing, to the extent the Debtor does not dispute or anticipate disputing the amount of those claims, as this will stop the accrual of interest on those claims and thus preserve value for the estate.

35. I am informed and believe that the proposed transaction is undertaken in good faith. It was negotiated at arm's length without any collusion or fraud of any kind, and I am informed and believe that neither Barnes & Noble nor the Buyer has any improper relationships with the Debtor, its insiders and other personnel, or its creditors. Moreover, I firmly believe that the sale achieves a fair price for the Debtor's assets and preserves the value of the estate for

creditors. As shown above, the proposed transaction is projected to result in full repayment of secured, administrative, and priority claimants, with a meaningful distribution to general unsecured claimants. This outcome is superior to the alternative, which would likely result in the Debtor closing its stores, turning over its inventory to the Secured Creditors, and no payments to administrative, priority, or general unsecured creditors.

36. I am aware of the four secured claims based on my review of the loan documents and the Debtor's financial records:

   a. The $491,234 loan of Commercial Bank of California is secured by a first position lien on all assets of the Debtor. While referred to as a singular "loan," this obligation is actually two separate loans that were extended at or about the same time, perfected at 1:37 p.m. on August 16, 2018, and share a maturity date of May 19, 2028. The annual interest rate on the first loan (account -3259) is 10.25% and on the second loan (account -3931) is 9.25%. The Debtor has been making monthly adequate protection payments of $4,097.43, which was calculated as the combined interest-only payment.

   b. The $506,935.38 loan of the U.S. Small Business Administration is secured by a second position lien on all assets of the Debtor. The annual interest rate is 3.75% and the loan matures on June 19, 2050. The Debtor has been making monthly interest-only adequate protection payments of $2,513.00.

   c. The $275,685.00 loan of Adrienne Kernan is secured by a third position lien on all assets of the Debtor. The annual interest rate on the loan is 5% and the loan matures in May 2028. The Debtor has been making monthly adequate protection payments of $2,750.00.

   d. The $500,000.00 loan of Stephen Mayer is secured by a fourth position lien on all assets of the Debtor. The annual interest rate on the loan is 8%. The Debtor has not been making any adequate protection payments on this loan because Mr. Mayer is a director, 31.1% equity holder, and insider of the Debtor.

37. Each of the four known secured claims is a blanket lien on all of the Debtor's assets. As demonstrated above, the proposed transaction will result in sale proceeds sufficient to pay all liens in full, with funds left over to pay administrative creditors and priority creditors in full, with a meaningful contribution to general unsecured creditors.

38. As set forth above, the proposed transaction is the result of good faith and arm's length negotiations, without any collusion or fraud of any kind, and in compliance with the applicable legal standards. The Debtor, Barnes & Noble, and the Buyer (to the best of my knowledge) did not engage in any conduct that would prevent the application of § 363(m) or otherwise implicate § 363(n) with respect to the consummation of the proposed sale or the transfer of the Purchased Assets to the Buyer.

39. In connection with the proposed sale, the Debtor seeks authorization to assign or novate the Post-Petition and Debtor Assumed Leases listed on **Exhibit B** to the Motion and to assume and assign or novate the Remaining Leases listed on **Exhibit C** to the Motion. The foregoing leases are an integral part of the proposed sale, and each contributes to the value of the Debtor's business as a going concern, thus increasing the value of the transaction. Assumption, assignment, and novation of the leases is a valid exercise of the Debtor's business judgment that enhances the value of the Debtor's estate.

40. As set forth in **Exhibits B** and **C** to the Motion, certain leases require payments to cure pre-petition defaults. Pursuant to the terms of the proposed transaction, the Debtor will pay the cure costs out of the sale proceeds. The Debtor is not aware of any other payments needed to cure pre- or post-petition defaults, or related pecuniary losses, of any non-debtor parties.

41. The Debtor, together with its advisors, evaluated and satisfied itself with the financial wherewithal of the Buyer as part of the diligence process. Based on information provided during due diligence and discussions with advisors, I am informed and believe that the Buyer has demonstrated a willingness and ability to perform under the proposed transaction, and it has provided (or I understand it will provide to the satisfaction of the Court and interested parties) adequate assurance of future performance of and under the assumed contracts and leases specified above.

42. I am informed and believe that the Bidding Procedures themselves are reasonable, transparent, and designed to maximize value for the estate. The Bidding Procedures set forth clear qualifications for bidders, establish a meaningful but achievable Minimum Overbid, and allow competing bids to be presented at the hearing. These procedures subject the proposed sale to a competitive marketplace, ensure fairness for all parties, and protect the estate against the risk of spurious or undercapitalized offers.

43. I am informed and believe that the proposed Break-Up Fee is reasonable and justified under the specific facts and circumstances of this case, and it should be approved. In negotiating the Break-Up Fee, the Debtor exercised sound business judgment and reasonably determined that such a fee is necessary to facilitate a successful sale process. Without the participation of Barnes & Noble and the Buyer, it is the Debtor's considered judgment that a going-concern sale would not be possible, and that a liquidation of its assets would be the consequence, resulting in no distributions to administrative, priority, or general unsecured creditors. Moreover, the Break-Up Fee is not sought in isolation but as an integral part of the Bidding Procedures and the overall transaction. Barnes & Noble and the Buyer's willingness to engage in the negotiation and execution of the APA, to act as a stalking horse, and to subject the offer to potential overbids was conditioned on the Break-Up Fee. Thus, approval of the Break-Up Fee ensures that the Bidding Procedures remain viable and that there is a baseline offer around which further bidding, if any, can be structured.

44. Importantly, the Buyer has agreed to proceed with the transaction and subject itself to potential overbids without requiring separate approval of the Bidding Procedures or Break-Up Fee, subject to the Debtor's agreement to seek approval of the Break-Up Fee before any overbidding commences and subject to the Buyer's right not to proceed should the Break-Up Fee not be approved before bidding commences. In doing so, I believe that Barnes & Noble and the Buyer have assumed risk for the benefit of the estate and its creditors, thereby helping to maximize recoveries. I believe that the amount of the Break-Up Fee is modest and not so substantial as to deter or chill other potential bidders. In fact, in the Debtor's business judgment, absent the Buyer's participation, there would be no opportunity for an auction as contemplated at

PERHAM DECLARATION 15

the hearing on the Motion. Furthermore, the Break-Up Fee will only be paid upon acceptance of a higher and better bid and completion of a sale to an alternative bidder. Thus, the Break-Up Fee is payable only upon the realization of a tangible benefit to the estate.

* * *

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on September 3, 2025.

                                                   /s/ Andrew Perham
                                                   Andrew Perham

PERHAM DECLARATION 16

Case: 25-40087    Doc# 88-5    Filed: 09/03/25    Entered: 09/03/25 15:12:12    Page 16 of 16