# Exhibit A

# ASSET PURCHASE AGREEMENT

among

## BI ACQUISITION CO. LLC,

AS PURCHASER

and

## BOOKS, INC.,

AS SELLER

**September [24], 2025**

**Table of Contents**

**[Insert When Final]**

Page

**Exhibits**

**Schedules**

_____

4908-6398-1143, v. 18

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made and entered into as of September [24], 2025 (as amended, supplemented and otherwise modified from time to time, this "<u>Agreement</u>") among (a) BI Acquisition Co. LLC, a Delaware limited liability company (and/or its designee(s) in accordance with <u>Section 12.5</u> herein (as applicable) "<u>Purchaser</u>") and (b) Books, Inc., a California corporation ("<u>Seller</u>"). Purchaser and Seller are sometimes individually referred to in this Agreement as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

## RECITALS:

**WHEREAS**, Seller operates an independent retail bookseller chain through each of its retail stores and related storage facilities (each, a "<u>Leased Real Property</u>", and collectively, the "<u>Leased Real Properties</u>", a complete list of which are set forth on <u>Schedule A</u> attached hereto), and its E-Commerce Platform (as defined below), (together with any other business of Seller as conducted in the 12-month period prior to the date hereof, the "<u>Business</u>");

**WHEREAS**, Seller filed a voluntary Petition (as defined below) for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (each as defined below) on January 20, 2025 (the "<u>Petition Date</u>");

**WHEREAS**, Seller desires to Transfer the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase, take delivery of, and acquire such Purchased Assets and to assume the Assumed Liabilities, subject to the terms and conditions set forth in this Agreement and the Bankruptcy Code;

**WHEREAS,** the transactions contemplated by this Agreement and the Transaction Documents (collectively, the "<u>Transactions</u>") will be consummated pursuant to and in accordance with the Sale Order (as defined below) pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court; and

**WHEREAS**, Seller, following filing of the voluntary Petition, as debtor and debtor-in- possession, has continued in the possession of its assets and in the management of the Business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations and warranties set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    <u>Definitions</u>. The following terms, as used herein, have the following meanings:

"<u>Accounts Receivable</u>" means all accounts, rights to payment and notes and other amounts receivable (whether current or non-current) of Seller (including the E-Commerce Platform), including receivables from credit card processors and the sale of Gift Cards (as defined in Section 2.3(c)).

1

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Back Up Bidder" means the bidder that is determined, in accordance with the Bid Procedures Order, to have made the next highest or otherwise best offer for the Purchased Assets after the Successful Bidder, as approved by the Bankruptcy Court.

"Bankruptcy Case" means the case of Seller commenced in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

"Bankruptcy Code" means title 11 of the United States Code, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of California.

"Bankruptcy Rules" means The Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as applicable to the Bankruptcy Case.

"Bid Procedures Order" means the order of the Bankruptcy Court entered in the Bankruptcy Case, in form and substance reasonably satisfactory to Purchaser, approving the procedures for the solicitation and consideration of bids for the sale of the Purchased Assets, including, without limitation, the procedures for the submission of competing bids, the conduct of any auction, the designation of the Successful Bidder and Back Up Bidder, the form and manner of notice to interested parties (including contract counterparties), the approval of any bid protections (if applicable), and such other matters as may be required by the Bankruptcy Court in connection with the sale of the Purchased Assets pursuant to Sections 105, 363, and 365 of the Bankruptcy Code.

"Break-Up Fee" means an amount payable in cash equal to One Hundred Fifty Thousand Dollars ($150,000). The Break-Up Fee shall be payable solely from, and contemporaneously with the distribution of, the cash proceeds received by Seller at the closing of a sale, transfer or other disposition of all or substantially all of the Purchased Assets to any person or entity other than Purchaser that is declared the "Successful Bidder" (or equivalent term) pursuant to the bidding procedures approved by the Bankruptcy Court.

"Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in San Francisco, California are authorized or required by Law to close.

"Business Employee" means all employees of Seller.

"Business Software" means all Software owned or otherwise Controlled by Seller that is used or held for use by Seller in the operation of the Business, excluding commercial "off-the- shelf" Software licensed on standardized terms from third parties with a replacement cost and/or aggregate annual license and maintenance fee payable by Seller of less than $5,000.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any regulations promulgated thereunder.

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

2

"<u>Closing Date</u>" means the date of the Closing.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Confidential Information</u>" means all non-public information (whether or not specifically identified as confidential), in any form or medium, that is disclosed to, or developed or learned by, the Business or Seller (including the Purchased Assets and the Assumed Liabilities), as the case may be, except to the extent exclusively related to the Excluded Assets or the Excluded Liabilities, including: (a) internal business information (including information relating to strategic plans and practices, business, accounting, financial or marketing plans, practices or programs, training practices and programs, salaries, bonuses, incentive plans and other compensation and benefits information and accounting and business methods); (b) identities of, individual requirements of, specific contractual arrangements with, and information about, the Business, its customers or any other third Persons involved or engaged with, in any respect, the Business and their respective confidential information; (c) any confidential or proprietary information of any third party that Seller or the Business have a contractual or other obligation to maintain the confidentiality of, or use only for certain limited purposes; (d) industry research compiled by, or on behalf of Seller or the Business; (e) non-public or proprietary compilations of data and analyses, processes, methods, performance records; and (f) non-public or proprietary information related to the Intellectual Property Rights used in the Business or by Seller.

"<u>Contracts</u>" means any contract, sub-contract, agreement, lease or sub-lease, license or sub- license, occupancy agreement, purchase order, supply agreement, commitment, note, bond, franchise, guarantee, indemnity, indenture, instrument, lease, license or other arrangement, understanding, or obligation, whether written or oral (including all amendments, side letters, supplements and modifications of any of the foregoing, and all rights and interests arising thereunder or in connection therewith), including any IP Contract and any Real Property Lease.

"<u>Contracts List</u>" means the Contracts listed on Schedule G of the Petition filed by Seller in the Bankruptcy Case.

"<u>Controlled</u>" or "<u>Controls</u>" means, solely when used in reference to any item of or rights in or to Intellectual Property Rights, ownership or other enforceable legal authority or right of Seller (whether by license or otherwise) to grant the right to use such item, or a license or sublicense under such Intellectual Property Rights, to any other Person, or with respect to Trade Secrets or other confidential proprietary information, the right to disclose such Trade Secrets or other confidential information to a third party without breaching the terms of any Contract to which Seller is a party.

"<u>Cure Costs</u>" means all amounts that must be paid and all obligations that otherwise must be satisfied as determined by the Bankruptcy Court or agreed to by Seller and the non-debtor counterparty to the applicable Purchased Contract (subject to approval of such agreement by Purchaser) pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of any Purchased Contract, including any Contract that becomes a Purchased Contract pursuant to <u>Section 2.5</u>.

"<u>Customer Loyalty Program</u>" means the Books Inc. Frequent Reader Program further described at https://booksinc.net/membership-rewards.

"<u>Disclosure Schedules</u>" means the disclosure schedules delivered by Seller to Purchaser concurrently with the execution and delivery of this Agreement.

"<u>Dispute Resolution Procedure</u>" means the procedure pursuant to which the items in dispute are referred by either Purchaser or Seller for determination as promptly as practicable to CohnReznick (the

3

"<u>Accounting Firm</u>"), which will be jointly engaged by Purchaser, on the one hand, and Seller, on the other hand, pursuant to an engagement letter in customary form which each of Purchaser and Seller must execute. The Accounting Firm must make a written determination, with respect solely to such disputed items (a "<u>Determination</u>")). The Determination must be based solely on presentations with respect to such disputed items by Purchaser and Seller to the Accounting Firm and not on the Accounting Firm's independent review; provided, that such presentations will be deemed to include any work papers, records, accounts or similar materials delivered to the Accounting Firm by Purchaser or Seller in connection with such presentations and any materials delivered to the Accounting Firm in response to requests by the Accounting Firm. Each of Purchaser and Seller will use commercially reasonable efforts to make its presentation as promptly as practicable following submission to the Accounting Firm of the disputed items, and each such party will be entitled, as part of its presentation, to respond to the presentation of the other Party and any question and requests of the Accounting Firm. Purchaser and Seller must instruct the Accounting Firm to deliver the Determination to Purchaser and Seller no later than thirty (30) calendar days following the date on which the disputed items are referred to the Accounting Firm. In deciding any matter, the Accounting Firm: (a) may only assign values to items in dispute and such values must be the same as or between the values asserted by Purchaser and by Seller, and (b) will be bound by the express terms, conditions and covenants set forth in the Agreement, including the definitions contained herein. The Accounting Firm may consider only those items and amounts in Purchaser's written notices or Seller's written responses that Purchaser and Seller were unable to resolve. In the absence of fraud or manifest error, the Determination will be conclusive and binding upon the parties hereto. It is the intent of the parties hereto that the process set forth in this definition of "Dispute Resolution Procedure" and the activities of the Accounting Firm in connection herewith are not (and should not be considered to be or treated as) an arbitration proceeding or similar arbitral process and that no formal arbitration rules should be followed (including rules with respect to procedures and discovery). Purchaser and Seller shall instruct the Accounting Firm to make its determination as an expert and not as an arbitrator. All fees and expenses (including reasonable attorney's fees and expenses and fees and expenses of the Accounting Firm) incurred in connection with such dispute will be borne by the parties based on the percentage which the portion of the contested amount not awarded to such Party bears to the amount actually contested by the Parties.

"<u>E-Commerce Platform</u>" means the series of software and hardware applications (and related services) integrated into and used in the operation of, and through which Seller sells inventory to consumers who place orders for such inventory through, the websites of Seller and related internet or "app" based sales, marketing, advertising and social media channels (including Business Social Media Accounts), including the Contracts pursuant to which such software and hardware applications (and related services) are owned and licensed by Seller.

"<u>Employee Benefit Plan</u>" means any "employee benefit plan" (as defined in ERISA § 3(3)) or other benefit or compensation plan, program, policy, practice, contract, agreement, or arrangement providing for retirement, medical, dental, vision, prescription, drug, employee assistance, wellness, severance, vacation, termination pay, workers' compensation, disability, death, hospitalization, relocation, cafeteria, dependent care, commuter or transportation, adoption assistance, tuition reimbursement, relocation, retention, change of control, deferred compensation, short-term incentive, long-term incentive, performance awards, stock or stock-related awards, fringe benefits or other employee benefits of any kind maintained, sponsored, or contributed or required to be contributed to by Seller or any ERISA Affiliate for the benefit of any Business Employee, or with respect to which Seller or any ERISA Affiliate has, or could reasonably be expected to have, any liability related to a Business Employee, other than a Multiemployer Plan, and other than governmental plans, programs, agreements or arrangements, or any plans, programs, agreements or arrangements mandated by a Governmental Authority or by applicable Law.

"<u>Environmental Laws</u>" means all applicable federal, state, local, municipal and foreign Laws concerning public or human health and safety (as it relates to Hazardous Substances), endangered or

4

threatened species, pollution, or protection of the environment (including natural resources, ambient air, soil, surface water or groundwater or subsurface strata), including all those relating to the presence, use, manufacture, production, generation, handling, distribution, transportation, treatment, storage, disposal, processing, labeling, discharge, Release, threatened Release, exposure to, control, or cleanup of, or exposures to, any Hazardous Substances (including CERCLA and analogous state Laws).

"Environmental Permits" means all Permits required under any applicable Environmental Law.

"Equity Securities" means, with respect to any Person, all shares of capital stock, equity interests, profits interests and participations in such Person's capital stock or other equity interests (however designated), and any debt, rights, warrants, stock appreciation rights, shares of restricted stock, restricted stock units or options or warrants exercisable or exchangeable for or convertible into any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"ERISA Affiliate" means, collectively, Seller and any Person under common control or treated as a single employer with, Seller, within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"Final Order" means a judgment or other Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Purchaser) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such judgment or other Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such judgment or other Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such judgment or other Order shall have become final in accordance with Bankruptcy Rule 8002; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such judgment or other Order, shall not cause an Order not to be a Final Order.

"GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied (unless otherwise expressly provided).

"Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental, self-regulatory, non-governmental regulatory or quasi-governmental authority of any nature (including any governmental agency, subdivision, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or taxing authority, or arbitral body.

"Hazardous Substances" means any pollutant, contaminant, chemical, material, substance, product, derivative, compound, mixture, solid, liquid, gas or waste and any other substance (in each instance, whether naturally occurring or manmade) that is hazardous (extremely, acutely or otherwise) toxic, infectious, carcinogenic, mutagenic, radioactive, a pollutant, a contaminant or is otherwise characterized by words of similar import or regulatory effect under or that could give rise to Liability under any Environmental Law, including petroleum and petroleum-derived substances, products, by products and wastes, radon, radioactive materials or wastes, asbestos in any form, urea, formaldehyde, lead or lead-containing materials, polychlorinated biphenyls and per- and polyfluoroalkyl substances.

5

"<u>Improvements</u>" means all leasehold improvements located, placed, constructed or installed on or under any parcel of Leased Real Property, including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing, refrigeration and cooling systems, facilities, lines, installations and conduits.

"<u>Indebtedness</u>" means, with respect to Seller (including with respect to the Business and/or the Purchased Assets), as of any given time of determination, including both the current and long- term portions thereof (whether or not contingent and including any and all principal, accrued and unpaid interest, prepayment premiums or penalties, related expenses, commitment and other fees, sale or liquidity participation amounts, reimbursements, indemnities and other amounts which would be payable thereon) without duplication, (a) any indebtedness for borrowed money, (b) any liabilities evidenced by bonds, debentures, notes or other similar instruments or debt securities, (c) any obligation evidenced by any letter of credit or bankers' acceptance, performance bonds, sureties or similar obligations, to the extent drawn, (d) any liabilities of Seller to a counterparty to settle interest rate and currency swap, cap and any other arrangements designed to provide protection against fluctuations in interest or currency rates, in each case, including any amounts payable to terminate such arrangements, (e) any obligations for the deferred purchase price or property, goods or services, (f) any obligations with respect to earnout, holdbacks or contingent payment obligations, (g) all capital leases (other than capital leases that are included in the Purchased Assets), (h) any synthetic lease obligations or any obligations in respect of off-balance sheet agreements or transactions that are in the nature of, or in substitution of, financings, (i) any obligations for interest, penalties or collection costs in respect of any of the foregoing, (j) any obligations secured by a Lien on any Purchased Asset whether or not such obligations are otherwise an obligation of Seller (other than with respect to Liens in connection with property Taxes and similar ad valorem obligations); (k) any guarantees of obligations of the type described in <u>clauses (a)</u> through <u>(j)</u> above (including by way of agreement to purchase products or securities, to provide funds for payment, to maintain working capital or other balance sheet conditions, to provide security (or, pursuant to an existing right, to provide security at a later date) by a Lien on property or otherwise to assure a creditor against loss).

"<u>Intellectual Property Rights</u>" means any and all rights in, arising out of, or associated with the following in any jurisdiction throughout the world: (a) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, including all applications, registrations and renewals of any of the foregoing, together with the goodwill connected with the use of and symbolized by the foregoing ("<u>Trademarks</u>"); (b) copyrights, and works of authorship, whether or not copyrightable, including all applications, registrations and renewals related to the foregoing ("<u>Copyrights</u>"); (c) trade secrets, confidential and proprietary know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information ("<u>Trade Secrets</u>"); (d) patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models); (e) Software; (f) internet domain name registrations and social media account or user names (including "handles"), all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto; and (g) other intellectual property and related proprietary rights, interests and protections.

"<u>Inventory</u>" means all supplies, goods, finished goods, materials, raw materials, work in process, perishable inventory, wholesale inventory and stock in trade owned by Seller (or otherwise by the Business), whether or not prepaid, and wherever located (including in any storage facility, Acquired Store or San Leandro Storage Facility), held or owned.

6

"Inventory Amount" means the dollar amount of the Inventory included in the Purchased Assets as of the Closing as determined in accordance with the methodology set forth on Schedule 2.6(c).

"IP Contract" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other Contracts, whether written or oral, relating to Intellectual Property Rights to which Seller is a party, beneficiary or otherwise bound, and that are used or held for use in the conduct of the Business.

"Key Employee" means any senior management level employee of Seller identified by Purchaser no later than ten (10) days prior to the Closing Date.

"Knowledge of Seller" or any other similar knowledge qualification in this Agreement means, as to a particular matter, the actual knowledge of any of the following individuals: (a) Andy Perham, (b) Nikolai Grant, (c) George Seamer, (d) Stephen Mayer, or (e) Michael Tucker.

"Law" means any federal, state, provincial, territorial, local, municipal, foreign, international, or multinational law (including common law), statute, regulation, rule, code, constitution, ordinance, judgment, decree, treaty, requirement or rule of law, or Order, enacted, adopted, promulgated, issued, applied by or administered or enforced by or on behalf of, any Governmental Authority or other similar authority.

"Leased Real Property" means any real property leased, subleased, licensed or otherwise occupied by Seller and used in the Business as currently conducted; a list setting forth each Leased Real Property as of the date hereof is attached hereto as Schedule A.

"Legal Proceeding" means any judicial, administrative or arbitral actions, investigation, litigation, suits, proceedings (public or private), causes of action, examination, dispute, charge, hearing, audit, assessment, inquiry or claims by or before any Governmental Authority, and any appeal from any of the foregoing.

"Lenders" means the following secured creditors of Seller: Stephen Mayer, Adrienne Kernan, Commercial Bank of California, and the U.S. Small Business Administration.

"Liability" means any liability (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, direct, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), debt, obligation, deficiency, interest, Tax, penalty, fine, penalty, claim, demand, judgment, cause of action or other loss (including loss of benefit or relief), cost or expense of any kind or nature whatsoever, whether asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due and regardless of when asserted.

"Licensed Intellectual Property" means the rights to any Intellectual Property Rights used or held for use in the Business that Seller is licensed or otherwise is permitted by any other Person to use such Person's Intellectual Property Rights pursuant to an IP Contract.

"Lien" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise), hypothecation, deed of trust, right of use or possession, right of setoff, successor liability, lease, servitude, encroachment, interest, pledge, security interest, Claim, encumbrance, restriction or restrictive covenant, charge, instrument, preference, priority, option, or right of first refusal or offer, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Material Adverse Effect" means any event, occurrence, fact, condition, development or change

7

that (a) has, or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, assets, liabilities or condition (financial or otherwise) of the Business, the Purchased Assets and/or the Assumed Liabilities, taken as a whole, or (b) has, or would reasonably be expected to prevent, materially delay, or materially impair the ability of Seller to carry out its obligations under this Agreement and to consummate the Transactions, except, in the case of the preceding clause (a), to the extent resulting from (i) changes or conditions affecting the industries generally in the geographic regions in which the Business operates; (ii) changes in national or international business, economic, political or social conditions generally, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (iii) changes in financial, banking or securities markets generally (including any disruption thereof or any decline in the price of securities generally or any market or index or any changes in currency exchange rates); and/or (iv) the commencement or pendency of the Bankruptcy Case; except, in the case of the foregoing <u>clauses</u> <u>(i)</u>, <u>(ii)</u>, and <u>(iii)</u>, to the extent such event, occurrence, fact, condition, development or change has a disproportionate adverse effect on the business, assets, liabilities, condition (financial or otherwise) or operating results of the Business, the Purchased Assets and/or the Assumed Liabilities, in each case, relative to other participants in the industries in which the Business operates.

"<u>Multiemployer Plan</u>" means any "multiemployer plan" (as defined in ERISA §3(37)) contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has, or could reasonably be expected to have, any liability.

"<u>Novated Leases</u>" means lease agreements that have been amended and restated and, effective as of the Closing, either assigned to Purchaser or novated to remove Seller as the tenant and insert Purchaser as the tenant, which lease agreements are identified as requiring novation on <u>Schedule A</u>.

"<u>Occupational Safety and Health Law</u>" means any Law of any federal, state or local Governmental Authority enacted or promulgated which requires or relates to Occupational Safety and Health Matters.

"<u>Occupational Safety and Health Liabilities</u>" means any cost, damage, expense, liability, obligation, duty to indemnify, defend or reimburse, or other responsibility consisting of or relating to (a) fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, remedial costs, and expenses arising under Occupational Safety and Health Laws; (b) financial responsibility for corrective action, including any investigation, or abatement action including, but not limited to, engineering or administrative controls, or the use of required personal protective equipment, required by any applicable Occupational Safety and Health Law, or by any final Order of any applicable Occupational Safety and Health Law jurisdiction; and (c) any other compliance, corrective or remedial measures required under Occupational Safety and Health Laws.

"<u>Occupational Safety and Health Matters</u>" means all matters related to health and safety of employees, temporary employees, independent contractors or employees of independent contractors at the Leased Real Property.

"<u>Open Source Materials</u>" means any Software or code (including any source code components, applications, plug-ins or libraries) that is distributed as "open source software", "freeware," pursuant to any license identified as an "open source license" by the Open Source Initiative (www.opensource.org/licenses), or is otherwise distributed publicly or made generally available in source code form under terms that permit modification and redistribution of such Software or code, including, without limitation, Software that is licensed under the GNU General Public License (GPL), GNU Lesser General Public License (LGPL), GNU Affero General Public License (AGPL), Mozilla License, Common Public License, Creative Commons Share-Alike License, Apache License, BSD License, Artistic License, or MIT License.

8

"<u>Order</u>" means any award, decision, stipulation, determination, writ, declaration, decree, order, directive, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

"<u>Ordinary Course of Business</u>" means the conduct by Seller of the Business in the ordinary course of business in substantially the same manner as conducted as of the date of this Agreement, consistent with past practice.

"<u>Organizational Documents</u>" means the articles of incorporation, certificate of incorporation, charter, by-laws, articles of formation, articles of organization, certificate of formation, regulations, operating agreement, certificate of limited partnership, limited liability company agreement or partnership agreement and all other similar documents, instruments or certificates executed, adopted or filed in connection with the creation, formation or organization of a Person, including any amendments thereto.

"<u>Permits</u>" means any licenses, permits, approvals, certificates (including certificates of occupancy), authorizations, operating permits, registrations, plans, consents, qualifications, waivers, franchises, filings, accreditations, certifications, easements, rights of way, notifications, exemptions, and clearances, together with all modifications, renewals, amendments, supplements and extensions thereof and applications therefor, of or from any Governmental Authority or issued or granted pursuant to any Law, as amended and supplemented, that are necessary or required to own, lease or use the Leased Real Property, Purchased Assets or to operate the Business.

"<u>Permitted Liens</u>" means (a) Liens that arise under applicable zoning Laws, building codes, and other similar land use restrictions imposed by Law relating to the Leased Real Property which, in each case, are not violated in any material respect by the current use and operation of the Leased Real Property; (b) Liens for utilities and current Taxes and assessments that are not yet due and payable, for which adequate reserves are being maintained and reflected on the Financial Statements to the extent required by GAAP, in each case, as set forth in the Sale Order; and (c) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any applicable Leased Real Property which do not, individually or in the aggregate, adversely affect the operation or use of such Purchased Asset;.

"<u>Person</u>" means an individual, corporation, partnership, limited liability company, association, joint venture, trust or other entity or organization, including a Governmental Authority.

"<u>Personal Information</u>" means personally identifiable information of Seller's employees, other personnel, agents, officers, directors, contractors, customers, potential and prospective customers, suppliers, and/or other Persons, which information may include name, address, other contact information, persistent identifier, financial account information, heath or medical information, insurance information, social security number, tax ID number, driver's license, mother's maiden name, date of birth, password, PIN number, employee ID number, payroll records, salary information or other human resources records and information, personal identification number or code, other account information and/or account activity information, other information or data that can be used for identity theft (including that which is not personally identifiable) or to identify a particular natural person, computer, device or software, and any other sensitive information regarding such Persons and means "personally identifiable information" as defined in 11 U.S.C. § 41A,

"<u>Petition</u>" means a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

"<u>Privacy and Data Security Laws</u>" means all privacy, security, data collection, data protection, data sharing, direct marketing, consumer protection, location tracking, customer tracking, behavioral marketing, and workplace privacy Laws, then-current industry standards, guidelines and practices, in each case, of any

9

applicable jurisdiction, including with respect to the collection, processing, storage, protection and disclosure of Personal Information.

"Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, advisors, successors or permitted assigns.

"Registered Purchased Intellectual Property" means all items of Purchased Intellectual Property that are subject to any issuance, registration, or application by or with any Governmental Authority or authorized private registrar in any jurisdiction, including issued patents, registered trademarks, domain names, and copyrights, and pending applications for any of the foregoing.

"Related Party" means (i) any direct or indirect holder of any Equity Securities of Seller, (ii) any Affiliate of any Person described in the foregoing clause (i), (iii) any member, employee, officer, director, equityholder or partner or any immediate family member of any Person described in the foregoing clause (i) or (ii) or (iv) any trust or estate in which any Person described in the foregoing clause (i), (ii) or (iii) has a substantial interest.

"Release" means any release, spill, emission, leaking, pumping, pouring, emitting, emptying, escaping, dumping, injection, abandonment, deposit, disposal, discharge, dispersal, migration or leaching of any Hazardous Substance into the environment, any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium or the indoor or outdoor ambient air.

"Representative" of any Person shall mean such Person's directors, managers, officers, employees, agents, attorneys, consultants, advisors or other representatives.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the Transactions.

"Sale Motion" means the Motion filed by Seller in the Bankruptcy Case seeking approval of the Transactions free and clear of all Liens (other than Permitted Liens and Assumed Liabilities), which Seller will file on or before August 27, 2025.

"Sale Order" means the Order entered by the Bankruptcy Court, in the form acceptable to Purchaser in its sole discretion and otherwise complying with Section 5.5, expressly authorizing and approving, among other things, the (a) sale of the Purchased Assets free and clear of all Liens (other than Permitted Liens and Assumed Liabilities) to Purchaser on the terms and conditions set forth herein, (b) assumption and assignment of the Purchased Contracts to Purchaser and the assumption by Purchaser of the Assumed Liabilities, in each case, on the terms and subject to the conditions set forth in this Agreement, and (c) mutual releases between Purchaser and Seller.

"Sale Order Deadline Date" means September 2226, 2025.

"San Leandro Storage Facility" means that certain storage facility located at 2483 Washington Avenue, San Leandro, CA 94577-5920.

"Software" means any and all computer programs, including operating system and applications software, firmware, computerized implementations of algorithms, program interfaces and other code, whether in source code or object code form (including all of the foregoing that is installed on computer hardware), including associated data files, databases, and related protocols, specifications, and all available documentation, including user manuals, relating to the foregoing.

"Straddle Period" means any Tax period that includes (but does not end on) the Closing Date.

10

"Subsidiary" of any Person means any other Person, of which such first Person (either alone or with any other Subsidiary) owns or controls, directly or indirectly, stock, other securities or other equity interests (a) having the ordinary voting power to elect a majority of the board of directors or other governing body of such Person, or (b) representing at least fifty percent (50%) of the outstanding stock, other securities or other equity interests of such Person.

"Successful Bidder" means the bidder that is determined to have made the highest or otherwise best offer for the Purchased Assets, as approved by the Bankruptcy Court.

"Tax" means, whether disputed or not, (a) any U.S. federal, state, local or non-U.S. income, profits, license, severance, occupation, windfall profits, capital gains, capital stock, transfer, registration, social security (or similar), production franchise, gross receipts, payroll, sales, employment, use, property (real or personal), excise, customs, value added, estimated, stamp, alternative or add-on minimum, withholding (including backup withholding), lease, service, service use, recording, documentary, intangibles, conveyancing, gains, unemployment, disability, net worth, escheat, abandoned property, environmental, premium, real property gains tax or impost, including any interest and penalties imposed with respect to such amounts and any additions to such amounts, and (b) any liability for the payment of any amounts of the type described in clause (a) above relating to any other Person as a result of being party to any agreement (including, but not limited to, any tax sharing or allocation arrangement, any agreement to indemnify such other Person or deemed agreement created by operation of law), being a successor or transferee of such other Person, or being (or ceasing to be) a member of the same affiliated, consolidated, combined or unitary group with such other Person prior to the Closing Date.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Transaction Documents" means this Agreement, the Assignment and Assumption Agreement, Bill of Sale, and each IP Assignment Agreement and Assignment and Assumption of Lease, and the other agreements, certificates, and instruments executed and delivered in connection with this Agreement or any of the foregoing (or the Transactions).

"Transfer" means to sell, assign, donate, contribute, pledge, hypothecate, convey, dispose, deliver or otherwise transfer.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, et seq. (1988) and any similar state or local "mass layoff" or "plant closing" laws.

"Withheld Amount" means $650,000.


Section 1.2    Cross References. Each of the following terms is defined in the Section set forth opposite such term:


| Term | Section |
|------|---------|
| [To Come When Final] | |

ARTICLE II

PURCHASE AND SALE

Section 2.1      Purchase and Sale. On to the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller agrees to Transfer, or cause to be Transferred, to Purchaser (and which Transfer(s) shall be in accordance with the Sale Order), and Purchaser agrees to purchase, acquire and accept from Seller, free and clear of all Liens except Permitted Liens, all right, title and interest of Seller as of the Closing Date in, to and under all assets, properties, claims and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill) wherever located and whether now existing or hereafter acquired that are owned, held or used by Seller or otherwise arising in connection with or related to the Business, in each case other than the Excluded Assets (collectively, the "Purchased Assets"), in accordance with the Sale Order, including the following:

(a)      (i) the Contracts described on Schedule 2.1(a)(i) (collectively, the "Assumed Contracts"), and (ii) the Real Property Leases (collectively, the "Assumed Leases", the Stores which are the subject of the Assumed Leases, each, an "Acquired Store" and collectively, the "Acquired Stores") described on Schedule 2.1(a)(ii) (the Assumed Contracts and Assumed Leases, collectively, the "Purchased Contracts"); provided, however, that, for the avoidance of doubt, the term Purchased Contracts shall include only those Contracts described on Schedule 2.1(a)(i) and Schedule 2.1(a)(ii);

(b)      all deposits, including those being held directly or indirectly by a third party, including, utility deposits, security deposits, deposits held by parties to the Purchased Contracts and deposits held by vendors or trade creditors;

(c)      all Accounts Receivable, and any security, Claim, remedy or other rights related to (or otherwise arising out of) such Accounts Receivable or to the collectability thereof or any other current asset;

(d)      all Inventory (including, without limitation, the Inventory at the San Leandro Storage Facility);

(e)      all tangible personal property and assets, including all machinery, equipment, tools, computers, in-store processors, front-end systems, point-of-sale systems, credit card readers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, store models, shelving, appliances, office supplies, production supplies, other miscellaneous supplies, and other tangible personal property of any kind owned by Seller

12

(collectively, the "Furnishings and Equipment"), wherever located, (except for any Furnishings and Equipment which Purchaser, in its sole discretion, expressly rejects in writing prior to or in connection with the Closing, which rejected Furnishings and Equipment shall constitute Excluded Assets for all purposes of this Agreement);

(f)     all transferable Permits (including all Environmental Permits) held by Seller (other than any Permit that relates solely to the San Leandro Storage Facility) (collectively, the "Transferred Permits"), including, for the avoidance of doubt, those Permits set forth on Schedule 3.7;

(g)     (x) all Intellectual Property Rights owned by Seller, including (A) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Seller with respect to such Intellectual Property Rights; (B) claims and causes of action with respect to such Intellectual Property Rights accruing on or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for past, present, or future infringement, misappropriation or other violation thereof, and rights to protection of interests therein under the Laws of all jurisdictions; (C) the E-Commerce Platform solely to the extent owned by Seller (collectively, the "Purchased Intellectual Property"), and (D) for the avoidance of doubt, all Intellectual Property Rights on Schedule 3.9(a), Schedule 3.9(b) and Schedule 3.9(j)(i) and (y) all Licensed Intellectual Property of Seller;

(h)     all automobiles, trucks, trailers, tractors, forklifts, other industrial vehicles and other motor vehicles used or held for use in the Business or otherwise owned by Seller;

(i)     all Improvements on any Leased Real Property (other than at the San Leandro Storage Facility);

(j)     all rights to the telephone and facsimile numbers and email addresses used by Seller;

(k)     all books, records, files and papers of Seller, except to the extent relating solely to an Excluded Asset or Excluded Liability, including customer sales, marketing, advertising, packaging and promotional materials, equipment logs, operating guides and manuals, creative materials, equipment maintenance files, quality control reports and procedures, customer complaints and inquiry files, stationary, forms, labels, shipping material, brochures, art work, photographs, studies, reports (including environmental reports), invoices, shipping records, standard forms of documents, customer, vendor, distributor and supplier lists, correspondence, maintenance, service, financial and accounting records, any personnel files or records related to the Transferred Employees (to the extent permitted by applicable Law), documentation relating to Intellectual Property Rights, Tax records and Tax Returns (except to the extent set forth in Section 2.2(j)) and all customer data and information derived from branded loyalty promotions or programs and other similar information related to customer purchases at the Stores or through the E-Commerce Platform, the wholesale business, or any similar platform owned, operated, or controlled by Seller; provided, however, that Seller will keep all accounting records including tax returns, sales tax returns, property tax returns, accounts payable and payroll.  Purchaser may request copies of files and Seller shall provide to Purchaser a copy of all such books, records, files and papers;

(l)     all prepaid or deferred items, charges or expenses (including prepaid rentals), except to the extent relating exclusively to an Excluded Asset or Excluded Liability;

(m)     (i) all transferable Insurance Policies, (ii) however any unearned premium

13

relating to Insurance Policies that are not transferred will be the property of Seller (iii) the amount of, and all rights to any insurance proceeds received by Seller in respect of the loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or relating to any Assumed Liabilities;

(n)      any rights, demands, claims, causes of action, commercial tort claims, credits, allowances, refunds, rebates, or rights of setoff (other than against Seller or any of its Affiliates) of Seller, other than any of the foregoing that relate exclusively to Excluded Assets or Excluded Liabilities;

(o)      all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with current or former employees, consultants, independent contractors or agents of Seller or with third parties, in each case, except to the extent relating exclusively to an Excluded Asset or Excluded Liability;

(p)      all unexpired, transferable warranties, indemnities, or guaranties from any third party with respect to the Business or any Purchased Asset or Assumed Liability, including any item of real property, personal property or equipment;

(q)      all goodwill, customer and referral relationships, other intangible property and all privileges of Seller or otherwise related to the Business; and

(r)      all other properties, assets and rights owned by Seller as of the Closing Date, or in which Seller has an interest, and which are not otherwise Excluded Assets.

Section 2.2      Excluded Assets. Notwithstanding any other provision of this Agreement to the contrary, including the generality of Section 2.1, the Purchased Assets shall not include the following specified assets, properties or rights (collectively, the "Excluded Assets"):

(a)      all nontransferable Permits of Seller;

(b)      corporate seals, stock record books, minute books, and Organizational Documents of Seller; provided, however, that, at or prior to the Closing, complete copies of the foregoing items shall be provided by Seller to Purchaser (and which copies, for the avoidance of doubt, shall not be deemed Purchased Assets);

(c)      any Contract of Seller not expressly described on Schedule 2.1(a)(i), Schedule 2.1(a)(ii) or Schedule A;

(d)      the San Leandro Storage Facility (including all Improvements, Furnishings and Equipment thereat);

(e)      all rights of Seller arising under this Agreement or in connection with the Transactions, including the Purchase Price;

(f)      any shares of capital stock or other equity interest in or issued by Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock of other equity interest in or issued by Seller;

(g)      any Employee Benefit Plan of Seller (each, an "Excluded Employee Benefit Plan") and any assets of any Excluded Employee Benefit Plan or any right, title or interest in or to any of the assets thereof or relating thereto;

14

(h)     all records and documents (i) to the extent relating solely to Excluded Assets or Excluded Liabilities, (ii) prepared by or on behalf of Seller in connection with this Agreement or the Transactions, or (iii) to the extent relating to the Bankruptcy Case;

(i)     all cash and bank accounts of Seller;

(j)     all Tax Returns of Seller, Tax records and other similar documents and records (all in the state in which such records and information currently exist) and any tax refunds that may become due to Seller; and

(k)     All claims arising under sections 542 through 550 of the Bankruptcy Code.

Section 2.3     Assumed Liabilities. Purchaser shall assume no obligation or other Liability of Seller, or of any predecessor or any Affiliate of Seller, other than the obligations and other liabilities explicitly set forth in this Section 2.3. Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required (subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such liabilities are owed), only the following obligations and other liabilities of Seller (collectively, the "Assumed Liabilities"):

(a)     all Claims and liabilities of Seller (not including any Taxes) arising on account of the ownership and operation of the Purchased Assets from and after the Closing;

(b)     any liability arising from the Purchased Contracts after the Closing but only to the extent that such liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, breach of warranty or other breach, default or violation by Seller or violation of Law by Seller on or prior to the Closing;

(c)     all liabilities for gift cards, whether sold or issued as store credits in stores, on the E-Commerce Platform or as gift certificates (collectively, "Gift Cards")[1],"), in each case, validly issued by Seller and outstanding as of immediately prior to the Closing; and

(d)     All liabilities for the Customer Loyalty Program to the extent that a customer who registered for Debtor's Frequent Reader program presents to Purchaser a statement of the customer's current rewards account balance after closing and the Debtor confirms the accuracy of such statement.

Nothing contained in this Agreement shall require Purchaser to pay or discharge any Assumed Liabilities prior to such Assumed Liabilities becoming due and payable including in accordance with the underlying terms of any Purchased Contract giving rise to or governing such Assumed Liabilities. The Parties acknowledge and agree that the disclosure of any obligation or liability on any schedule to this Agreement or the Transaction Documents shall not create an Assumed Liability or liability of Purchaser, except where such disclosed liability has been expressly assumed by Purchaser as an Assumed Liability in accordance with the provisions of this Section 2.3.

Section 2.4     Excluded Liabilities. Notwithstanding any other provision of this Agreement or any Transaction Document to the contrary, the Parties expressly acknowledge that Purchaser

---

[1] NTD—Are store credits issued as gift cards?

is assuming only the Assumed Liabilities as expressly set forth herein and is not assuming, and shall not be obligated to assume or pay, perform, or discharge, any other Claim against, obligation or other Liability of Seller (or any of its Affiliates) of whatever nature, whether presently in existence or arising hereafter, and shall under no circumstances be liable or responsible for any Liabilities (other than the Assumed Liabilities) of Seller, or any predecessor or Affiliate thereof, whether existing on the Closing Date or arising thereafter as a result of any action, omission or circumstance taking place prior to the Closing (including any Indebtedness and all Liabilities for non-compliance by Seller or Purchaser or any of their respective Affiliates with any bulk sales, bulk transfer or similar Law). Purchaser shall not be a successor in interest to Seller for any purpose and is not answerable for any successor liability Claims. All other Claims, obligations and other Liabilities shall be retained by and remain obligations and Liabilities of Seller and its bankruptcy estate, including all Indebtedness of Seller (all such obligations and other Liabilities not being expressly assumed herein as an Assumed Liability being herein referred to, collectively, as the "Excluded Liabilities").

Section 2.5    Assumption/Assignment of Contracts and Rights.

(a)    The Purchased Contracts shall be assumed by Seller and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code, except to the extent the Purchased Contracts have been assumed prior to the Closing, in which case they will be assigned to Seller. Schedule 2.1(a)(i) and Schedule 2.1(a)(ii) attached hereto designates the Assumed Contracts and Assumed Leases that shall constitute Purchased Contracts.

(b)    Purchaser shall reasonably cooperate with Seller (which cooperation shall not require Purchaser to pay additional amounts or guaranty any obligations owed to any counterparties to Purchased Contracts) to assist Seller in complying with the requirements under Section 365 of the Bankruptcy Code necessary to assign to Purchaser the Purchased Contracts. Seller shall reasonably cooperate with Purchaser as reasonably requested by Purchaser (i) to allow Purchaser to enter into an amendment of any Contract effective as of the Closing (and Seller shall reasonably cooperate with Purchaser to the extent reasonably requested by Purchaser in negotiations with the counterparties thereof); and (ii) to otherwise amend any Contract; provided that Seller shall not be required to enter into any such amendment.

(c)    From and after the date hereof through the Closing, Seller shall not reject or take any action (or fail to take any action that would (or would reasonably be likely to) result in rejection by operation of Law) to reject, repudiate or disclaim any Real Property Lease or other Contract without the prior written consent of Purchaser.

Section 2.6    Purchase Price; Allocation of Purchase Price.

(a)    The aggregate consideration for the Purchased Assets (the "Purchase Price") will be:

(i)    $3,250,000, as adjusted pursuant to Section 2.6(c) (the "Cash Portion"); and

(ii)    the assumption of the Assumed Liabilities which are set forth in Section 2.3 above.

Notwithstanding anything to the contrary herein, for all Tax purposes, Seller shall be treated as receiving the Cash Portion in full from Purchaser and using a portion of the Cash Portion to pay Lenders in accordance with Sections 2.6(b)(i) and (b)(ii).

16

(b)     At the Closing,

(i)     Purchaser shall pay, or cause to be paid, out of $2,600,000 of the Cash Portion of the Purchase Price (including the portion of the Cash Portion attributable to the Deposit (which shall be delivered in accordance with, and subject to the terms set forth in, Section 2.11)), on behalf of Seller, in immediately available funds by wire transfer to the Lenders, the amount set forth in the Payoff Letters, except to the extent there is any challenge to such payment or objection to any of the Lenders' claims, in which case the funds shall be paid to Seller or its counsel with the unpaid Lenders' claims (if any) attaching to such proceeds; and

(ii)     After taking into account the payments contemplated by the preceding clause (i) and the Withheld Amount, Purchaser shall pay, or cause to paid, the remaining amount of the Cash Portion of the Purchase Price, in immediately available funds by wire transfer to an account of Seller designated by Seller, by notice to Purchaser, which notice shall be delivered not later than two (2) Business Days prior to the Closing Date.

(c)     Prior to the Closing and in any event at least three (3) Business Days prior to the Closing Date, Seller shall deliver to Purchaser its good faith estimate (the "Closing Estimate") of the full trial balance together with the Inventory Amount, and Seller shall provide Purchaser with a reasonable opportunity in advance of such delivery to review the Closing Estimate and supporting documentation, and shall consider Purchaser's comments thereon in good faith.  Seller shall prepare and deliver to Purchaser a certificate, signed by Seller, certifying Seller's good faith determination (including all calculations in reasonable detail) of the adjusted Cash Portion, which will be determined by reducing the Cash Portion to the extent the estimated Inventory Amount is less than $1,200,000 or increasing the Cash Portion to the extent the estimated Inventory Amount is greater than $1,300,000. The Inventory Amount (and estimate of such amount) will be prepared in a manner consistent with the Seller's historical methodology for determining such amount.

(d)     Within ninety (90) days after the Closing Date, Purchaser will prepare and deliver to Seller a certificate (the "True-Up Certificate"), signed by Purchaser, certifying Purchaser's good faith determination of the actual Inventory Amount in a manner consistent with the methodology set forth on Schedule (c), and identifying any adjustments to the Cash Portion as a result of such amounts being greater or less than the amounts set forth in the Closing Estimate. If Seller does not object to the calculation of the actual Inventory Amount in the True-Up Certificate within forty-five (45) days after Seller's receipt thereof, or accepts Purchaser's determination as set forth in the True-Up Certificate during such forty-five (45) day period, then the Cash Portion will be adjusted as set forth in the True-Up Certificate, as further provided below.  If Seller objects to the calculation in the True-Up Certificate, then Seller must notify Purchaser in writing of such objection within forty-five (45) days after Seller's receipt of the True-Up Certificate (such notice setting forth in reasonable detail the basis for such objection, an "Objection Notice"). During the forty-five (45) day period following Seller's receipt of the True-Up Certificate, Purchaser will permit Seller reasonable access to such work papers (subject to entering into any customary access, hold harmless or "non-reliance" letters) relating to the preparation of the True-Up Certificate, as may be reasonably required to permit Seller to review the manner in which the True-Up Certificate was prepared, and all information received pursuant to this Section 2.6(d) will be kept confidential pursuant to by Seller. Purchaser and Seller will thereafter negotiate in good faith to resolve any objections set forth in the Objection Notice. If Purchaser and Seller are unable to resolve all of such differences within twenty (20) calendar days of Purchaser's receipt of the Objection Notice, then upon request of either Party the Parties will resolve the dispute by way of the Dispute Resolution

Procedure. The Parties agree that any portion of any account receivable existing as of the Closing Date and that has not been collected by Purchaser on or before the date that Purchaser delivers to Seller the True-Up Certificate will be deemed uncollectible. The final Inventory Amount determined in accordance with this Section 2.6(d) (whether by agreement of the Parties or the Dispute Resolution Procedure) will be used to calculate a post-Closing adjustment to the Purchase Price to correct for any variance from the estimated Inventory Amount. If the adjustment is in Seller's favor, then Purchaser will pay or cause to be paid to Seller the applicable amount in immediately available funds within three (3) Business Days after the date on which the amounts in the True-Up Certificate are finally determined. If the adjustment is in Purchaser's favor, then Purchaser shall recover such amount by immediate set-off against the Withheld Amount.

(e)     Purchaser shall, within ninety (90) days after the Closing Date, submit to Seller a statement of Purchaser's allocation of the Purchase Price, applicable Assumed Liabilities and other relevant items in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (or, if applicable, any similar provision under state, local or foreign Law or regulation) (the "Proposed Allocation Schedule"). Seller will have thirty (30) days following delivery of the Proposed Allocation Schedule during which to notify Purchaser in writing (an "Allocation Notice of Objection") of any objections to the Proposed Allocation Schedule, setting forth in reasonable detail the basis of the objections. If Seller agrees in writing to the Proposed Allocation Schedule or fails to timely deliver an Allocation Notice of Objection in accordance with this Section 2.6(e), the Proposed Allocation Schedule will be conclusive and binding on all Parties (any such conclusive and binding allocation, together with any revisions thereto, the "Final Allocation Schedule"). If Seller submits an Allocation Notice of Objection, then for twenty (20) Business Days after the date Purchaser receives the Allocation Notice of Objection (or such longer period as the Parties shall mutually agree), Purchaser and Seller will use commercially reasonable efforts to agree on the allocations. If Purchaser and Seller agree on the allocations, such revised allocations will become the Final Allocation Schedule. The allocation provided in the Final Allocation Schedule shall be binding on Purchaser and Seller for all purposes, including the reporting of gain or loss and determination of basis for income Tax purposes, and except in connection with any contest or settlement described in the last sentence of this Section 2.6(e), each of the Parties agrees that it will file a statement (on IRS Form 8594 or other applicable form) setting forth such allocation with its federal and applicable state income Tax Returns consistent with the Final Allocation Schedule and will also file such further information or take such further actions as may be necessary to comply with the Treasury Regulations that have been promulgated pursuant to Section 1060 of the Code and similar applicable state Laws and regulations. If Purchaser and Seller do not reach an agreement within twenty (20) Business Days after the date Purchaser receives the Allocation Notice of Objection (or such longer period as the Parties shall mutually agree) (and are not deemed to have agreed to the Proposed Allocation Schedule under this Section 2.6(e)), there shall be no Final Allocation Schedule, and each of Purchaser and Seller shall file, and shall permit its Affiliates to file, federal and applicable state income Tax Returns (including IRS Form 8594 or other applicable form) in any manner that it chooses regarding the allocation of the Purchase Price, applicable Assumed Liabilities and other relevant items. Seller and Purchaser each agree to provide the other with any information required to complete the allocation statement under this Section 2.7(e). If any Governmental Authority disputes the Final Allocation Schedule, the Party receiving notice of the dispute shall promptly notify the other Party hereto; provided, however, that either Party shall be entitled (in its complete discretion) to contest or to settle any allocation issue with any Governmental Authority.

Section 2.7     Closing. The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place remotely via the electronic or other exchange of documents and signature pages no later than two (2) Business Days after satisfaction

or waiver (if applicable) of the conditions set forth in Article X (other than those requiring a delivery, or the taking of other action, at the Closing), or at such other time or place as Purchaser and Seller may agree; provided, however, that the Parties intend to, and will use reasonable efforts to, cause the Closing to occur on or prior to the End Date (subject to applicable requirements and restrictions imposed by the Bankruptcy Code or the Bankruptcy Court). Upon consummation of the Closing, the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 12:01 a.m. (New York time) on the Closing Date.

Section 2.8    Deliveries by Seller. At the Closing, Seller will deliver, or cause to be delivered, to Purchaser (unless delivered to Purchaser prior to the Closing) the following:

(a)    a Bill of Sale substantially in the form attached hereto as Exhibit A (the "Bill of Sale"), duly executed by Seller;

(b)    an Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit B (the "Assignment and Assumption Agreement"), duly executed by Seller;

(c)    the Lease Assignment(s) and Assumption Agreement(s) substantially in the form attached hereto as Exhibit C and, upon the request of Purchaser, in recordable form (the "Lease Assignment and Assumption Agreement") for the assumed Real Property Leases, duly executed by Seller;

(d)    a copy of the Sale Order;

(e)    a short-term occupancy agreement for the San Leandro Facility to be mutually agreed, duly executed by Seller;

(f)    copies of all Purchased Contracts (together with all material amendments, supplements or modifications thereto) delivered electronically;

(g)    an assignment agreement or agreements, duly executed by Seller, transferring the Intellectual Property Rights included in the Purchased Assets to Purchaser, such agreement to be on customary terms and conditions and negotiated and agreed in good faith by Seller and Purchaser as soon as reasonably practicable following the date of this Agreement (but in no event later than the Closing Date) (the "IP Assignment Agreement");

(h)    a duly completed Form W-9 executed by Seller;

(i)    an officer's certificate (in form and substance reasonably satisfactory to Purchaser) duly executed by a senior officer of Seller, certifying the matters set forth in Sections 10.2(a), (b) and Section 10.2(c);

(j)    without limiting Section 10.2(h), each fully executed amendment (executed by both Seller and the other counterparties thereto, including the landlord) to a Novated Lease, each in form and substance satisfactory to Purchaser;

(k)    a statement of all liabilities for Gift Cards validly issued by Seller and outstanding as of immediately prior to the Closing Date as an excel file containing the following attributes: certificate id, serial number, activation date, activation amount and current balance;

19

(l)   an assumption of liabilities agreement, duly executed by Seller, transferring all Gift Cards to Purchaser, to be agreed in good faith by Seller and Purchaser as soon as reasonably practicable following the date of this Agreement (but in no event later than the Closing Date) (the "GC Agreement");

~~(m)   (x) all customer account details and/or contacts list, including, without limitation, email addresses, telephone numbers and any recorded marketing and opt-in/out preferences, as of immediately prior to the Closing Date as an excel file for and to the extent such customers have affirmatively consented to the transfer of their personal data to Purchaser, and (y) customer's order history, to the extent such customers have affirmatively consented to the transfer of their Personal Information to Purchaser, and (z) copies of executed consents to the transfer of Personal Information to Purchaser from such customers;~~

~~(n)   to the extent such customers have affirmatively consented to the transfer of their Personal Information to Purchaser, a list of Customer Loyalty Program members and necessary account details to advise of all cumulated benefits of each member to date as of immediately prior to the Closing Date as an excel file; and~~

(m)   customer's order history for any orders which are open but have not been delivered as of the Closing date ;

~~(o)~~(n)  all other documents, instruments of transfer and writings reasonably requested by Purchaser to be delivered by Seller at or prior to the Closing in order to vest in Purchaser all of Seller's right, title and interest to the Purchased Assets, free and clear of all Liens other than Permitted Liens.

Section 2.9    Deliveries by Purchaser. At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless delivered to Seller prior to the Closing) the following:

(a)   an officer's certificate (in form and substance reasonably satisfactory to Seller), duly executed by a senior officer of Purchaser, certifying the matters set forth in Sections 10.3(a) and (b);

(b)   the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)   the Bill of Sale, duly executed by Purchaser;

(d)   the Lease Assignment and Assumption Agreement, duly executed by Purchaser;

(e)   the IP Assignment Agreement, duly executed by Purchaser: and

(f)   the GC Agreement, duly executed by Purchaser.

Section 2.10    Withholding Rights. Notwithstanding anything to the contrary in this Agreement, Purchaser and its Affiliates will be entitled to deduct and withhold from the aggregate consideration otherwise deliverable under this Agreement, and from any other payments otherwise required pursuant to this Agreement, such amounts as Purchaser or its Affiliates are required to deduct and withhold with respect to any deliveries and payments under applicable Tax Law. In the event that any such withholding is made, Purchaser shall give Seller at least three (3) Business Days' prior written notification of its intention to make any such deduction or withholding and shall use commercially reasonable efforts

20

4908-6398-5148, v. 17

to cooperate with Seller to mitigate, reduce or eliminate any such deduction or withholding. To the extent that amounts are so withheld and paid to the applicable Governmental Authority, they will be treated for all purposes of this Agreement as having been delivered and paid to Seller in respect of which such deduction and withholding was made.

Section 2.11    Deposit.

(a)    Concurrently with the execution of this Agreement, Seller and Purchaser are entering into that certain escrow agreement (the "Escrow Agreement"), with Citibank N.A., (the "Escrow Agent"), and, on or before fifth Business Day following the effective date of this Agreement, Purchaser shall deposit into escrow with the Escrow Agent an amount equal to $150,000 (such amount, together with any interest accrued thereon prior to the Closing Date, the "Deposit") by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement to an account specified therein (the "Escrow Account"). Subject to the following sentence, the Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of Seller. The Deposit shall become payable upon the earlier of (i) the Closing, in which case the entirety of the Deposit shall be used to pay a portion of the amount required under the Payoff Letters in accordance with Section 2.6(b)(i), (ii) the termination of this Agreement pursuant to Section 11.1(c) (or Section 11.1(b) at a time when Seller is entitled to terminate this Agreement pursuant to Section 11.1(c)) in which case the Deposit shall be paid to Seller in accordance with this Section 2.11 (any termination of this Agreement contemplated by this clause (ii), a "Purchaser Default Termination") and (iii) the termination of this Agreement for any reason other than as contemplated by the preceding clause (ii), in which case the proceeds of the Deposit shall be distributed to Purchaser by wire transfer in accordance with the Escrow Agreement. Purchaser shall have responsibility for one hundred percent (100%) of the costs, fees and expenses associated with establishing the Escrow Account pursuant to the Escrow Agreement.

(b)    In the event the Deposit is paid to Seller in connection with a Purchaser Default Termination, Purchaser shall have no further Liability hereunder. Each of the Parties expressly acknowledges and agrees that in the event that the Deposit is paid to Seller pursuant to this Section 2.11, (x) Seller's right to receive payment of such amount shall constitute the sole and exclusive remedy of Seller (and any Related Party) against Purchaser and each of its Affiliates for all losses and damages in respect of this Agreement and the other Transaction Documents and the Transactions; and (y) neither Seller nor any Related Party shall be entitled to commence or pursue any Legal Proceeding against Purchaser or any of its Affiliates arising out of or in connection with this Agreement or the Transaction Documents or the failure to consummate the Transactions.

(c)    Prior to the Closing (including as a result of a Purchaser Default Termination or any other failure by Purchaser to consummate the transactions contemplated hereby, including in respect of intentional or willful breach hereof), the maximum aggregate Liability of Purchaser and its Affiliates for losses and damages in connection with this Agreement and the other Transaction Documents and the Transactions shall be limited to the Deposit, and neither Seller nor any Related Party shall seek or obtain, nor shall it or they cause or direct any of its or their Representatives or any other Person on its or their behalf to seek or obtain, any monetary award or any losses or damages of any kind (including damages for the loss of the benefit of the bargain, opportunity cost, loss of premium, time value of money or otherwise, or any consequential, special, expectancy, indirect or punitive damages), in the aggregate, in excess of the Deposit against Purchaser or any of its Affiliates, collectively, and recovery of the Deposit from the Escrow Account in accordance with the terms of the Escrow Agreement and this Section 2.11 will be Seller's sole and exclusive remedy and source of recovery for any amounts owing to it as a result of any Purchaser Default Termination, any other failure by Purchaser to consummate the

Transactions or any other matter arising in connection with this Agreement, the other Transaction Documents or the Transactions.

(d)     In the event the Deposit becomes payable to Seller by reason of a Purchaser Default Termination, the Escrow Agent shall, within two (2) Business Days after receiving notice of such Purchaser Default Termination from Seller and Purchaser, disburse the Deposit to an account designated by Seller by wire transfer of immediately available funds to be retained by Seller for its own account.

(e)     At the Closing, the entirety of the Deposit shall become payable and used to pay a portion of the Cash Portion of the Purchase Price in accordance with Section 2.7(b)(i) and the Escrow Agent shall, within two (2) Business Days after receiving notice of the Closing from the Parties, disburse the Deposit in accordance with the foregoing by wire transfer of immediately available funds.

(f)     If this Agreement or the Transactions are terminated other than for a termination which constitutes a Purchaser Default Termination, Seller and Purchaser shall instruct the Escrow Agent to, and the Escrow Agent shall, within two (2) Business Days after such instruction, return to Purchaser the Deposit by wire transfer of immediately available funds, to an account designated by Purchaser.

(g)     The Parties agree to promptly deliver any joint instruction that the Escrow Agent may require to effectuate the payments contemplated by this Section 2.11.

Section 2.12     Effectiveness.  Notwithstanding any other provision in this Agreement, and regardless of whether Purchaser has delivered its signature page, this Agreement shall not be binding on Purchaser unless and until it is also binding on Seller pursuant to an Order issued by the Bankruptcy Court approving this Agreement.

Section 2.13     Personal Information. Seller will file a motion with the Bankruptcy Court for the appointment of a consumer privacy ombudsman, and will coordinate with such ombudsman to ensure that he or she has access to Seller's books and records necessary to perform the review as required by 11 U.S.C. § 363(b)(1) and § 332. The ombudsman's report shall be filed at or prior to the hearing on the Sale Motion. Such review will be at the cost of Seller.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Schedules (which disclosures in any section or paragraph of the Disclosure Schedules shall qualify only (a) the corresponding section or paragraph of this Article III, and (b) other sections or paragraphs of this Article III to the extent that such disclosure sets forth facts in sufficient detail so that the relevance of such disclosure to such other section or paragraph would be reasonably apparent to a reader of such disclosure), and subject to the terms, conditions and limitations set forth in this Agreement, Seller hereby represents and warrants to Purchaser as of the date of this Agreement and as of the Closing as follows:

Section 3.1     Organization.  Seller is a corporation validly existing under the Laws of California, and has the power and authority to own, lease and operate the Purchased Assets, and to carry on in all material respects the Business as now being conducted. Seller is duly licensed or qualified to transact business and is in good standing in each jurisdiction in which the ownership of Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary. Schedule

3.1 sets forth a true, correct and complete list of each jurisdiction in which Seller is licensed or qualified to do business as a foreign entity. Seller has made available to Purchaser true, complete and correct copies of its Organizational Documents.

Section 3.2    Due Authorization. Subject to the entry of the Sale Order and receipt of requisite Bankruptcy Court approvals, the execution, delivery and performance by Seller of its obligations under this Agreement, the Transaction Documents and the consummation of the Transactions are within Seller's corporate powers and have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement, the Transaction Documents and the consummation of the Transactions by Seller. Subject to entry of the Sale Order and requisite Bankruptcy Court approvals, this Agreement has been duly and validly executed and delivered by Seller, and this Agreement constitutes, and the other Transaction Documents to which Seller is a party will when executed constitute, assuming this Agreement and the other Transaction Documents constitute or will constitute valid and binding agreements of Purchaser, a valid and binding agreement of Seller that is enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, receivership, insolvency, reorganization, moratorium, fraudulent conveyance, equitable subordination or similar Laws of general application and other Laws relating to or affecting creditors' rights or general principles of equity (whether considered in a proceeding in equity or at law) (collectively, the "Enforceability Exceptions").

Section 3.3    Governmental Authorization. Except as disclosed on Schedule 3.3, Seller is not required to file, seek or obtain any notice, authorization, approval, Order, Permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by Seller of this Agreement, the Transaction Documents or the consummation of the Transactions by Seller other than consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court.

Section 3.4    Noncontravention. Subject to the entry of the Sale Order and receipt of requisite Bankruptcy Court approvals, and subject to the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 3.3 being made, given or obtained, the execution, delivery and performance by Seller of this Agreement and the Transaction Documents and the consummation of the Transactions do not and will not (a) violate Seller's Organizational Documents; (b) assuming compliance with the matters referred to in Section 3.3, violate any Law applicable to Seller or by which any of the Purchased Assets is bound; (c) violate, conflict with, constitute a breach or a default under (or event which, with the giving of notice or lapse of time, or both, would become a default) or give rise to any right of termination, amendment, revocation, suspension, payment, loss of benefit under, cancellation or acceleration of any Purchased Contract, except for breaches and defaults referred to in Section 365(b)(2)(A)-(C) of the Bankruptcy Code; or (d) result in the creation or imposition of any Lien on any Purchased Asset.

Section 3.5    No Subsidiaries. Seller has no Subsidiaries and does not own or have any interest in, directly or indirectly, any Equity Securities of any Person.

Section 3.6    Litigation. Except as disclosed on Schedule 3.6, as of the date hereof, there are no Legal Proceedings pending against or, to the Knowledge of Seller, threatened against Seller including with respect to the Purchased Assets, Assumed Liabilities or the Business, to or before any Governmental Authority which (a) if determined adversely to Seller, would, individually or in the aggregate, materially and adversely affect the Purchased Assets, Assumed Liabilities or the Business or (b) questions the validity of this Agreement, any Transaction Document or the Transactions, or in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions. Other than in respect of the Bankruptcy Case, neither Seller nor, to the Knowledge of Seller, any manager, director, officer or key employee involved in the Business, in his or her capacity as such, is, or since January 1, 2022 has been, a party to, subject to, or

23

in default with respect to any Order with respect to the Purchased Assets, Assumed Liabilities or the Business, other than any such Order that is no longer in effect where no injunctive or equitable relief was granted and where the monetary damages were covered by insurance.

Section 3.7    Permits. Schedule 3.7 sets forth a complete and correct list of all Permits (including Environmental Permits) required to lawfully own the Purchased Assets and conduct and operate the Business as currently conducted in a manner consistent with the current practices of Seller. Except as set forth on Schedule 3.7, (a) Seller is, and has been since January 1, 2022, in material compliance with the terms and requirements of each such Permit and each such Permit is valid as of the date hereof and is presently in full force and effect; and (b) no written notice of revocation, modification, refusal to renew or violation of any such Permit has been received from any Governmental Authority and, as of the date hereof, there is no Legal Proceeding pending or, to Seller's Knowledge, threatened that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any such Permit.

Section 3.8    Intellectual Property Rights.

(a)    Schedule 3.8(a) sets forth an accurate, true and complete list of all Registered Purchased Intellectual Property, specifying as to each item, as applicable: the title, mark, or patent (as applicable); the record owner and inventor(s), if any; the jurisdiction by or in which it has been issued, registered, or filed; the patent, registration, or application serial number; the issue, registration, or filing date; the current status; and all material unregistered Trademarks and Copyrights that are included in the Purchased Intellectual Property.

(b)    Schedule 3.8(b) sets forth an accurate, true and complete list of all social media accounts, pages and profiles owned by Seller or relating to or used in the Business (the "Business Social Media Accounts"). All Business Social Media Accounts are associated with a Seller company email address and all login credentials (e.g., user names and passwords) are under the sole control of only Seller employees.

(c)    Seller is the sole and exclusive legal, beneficial owner, and with respect to Registered Purchased Intellectual Property, record owner, of all right, title and interest in and to the Purchased Intellectual Property, and has the valid and enforceable right to use all Licensed Intellectual Property, in each case, free and clear of all Liens (except Permitted Liens). The Purchased Intellectual Property and the Licensed Intellectual Property constitute all of the Intellectual Property Rights used or held for use in or necessary to operate the Business as presently conducted by Seller (and as conducted in the Ordinary Course of Business). Neither the execution, delivery, or performance of this Agreement, nor the consummation of the Transactions, will result in the loss or impairment of or payment of any additional amounts with respect to, or require the consent of any other Person in respect of, Purchaser's right to own or use any Purchased Intellectual Property or Licensed Intellectual Property in the conduct of the Business as currently conducted. Immediately following the Closing, all Purchased Intellectual Property and Licensed Intellectual Property will be owned or available for use by Purchaser on substantially the same terms as they were owned or available for use by Seller immediately prior to the Closing.

(d)    All of the material Purchased Intellectual Property is valid and enforceable. All Registered Purchased Intellectual Property is subsisting and in full force and effect and has not expired or been abandoned. Seller has not received any written communications alleging that any of the Purchased Intellectual Property is not valid and enforceable, or that any Registered Purchased Intellectual Property is not subsisting and in full force and effect. All required filings and fees related to the Registered Purchased Intellectual Property have been timely filed with and paid (after giving effect to permitted extensions of relevant deadlines) to the relevant

24

Governmental Authorities and authorized registrars, and all Registered Purchased Intellectual Property is otherwise in good standing. All assignments and other instruments necessary to establish, record, and perfect Seller's ownership interest in the Registered Purchased Intellectual Property have been validly executed, delivered, and filed with the relevant Governmental Authorities and authorized registrars. All Registered Purchased Intellectual Property and the filing, prosecution and maintenance thereof, have been and are in compliance with all requirements under applicable Law (including the duty of candor, payment of filing, examination, and maintenance fees and proofs of working or use).

(e)     Neither Seller nor, to the Knowledge of Seller, any other party to any material IP Contract is, or is alleged to be, in breach of or default under, or has provided or received any notice of breach of, default under, or intention to terminate (including by non-renewal) or to withhold its consent in connection with a transfer to Purchaser (as required pursuant to the Transactions) of, any material IP Contract.

(f)     The conduct of the Business by Seller as currently conducted (and as conducted in the Ordinary Course of Business during the preceding 12 months) has not infringed upon, misappropriated or otherwise violated, and does not infringe, misappropriate or otherwise violate any Person's Intellectual Property Rights, and no such claims are pending or threatened in writing against Seller or have been received by Seller since January 1, 2022, and, to the Knowledge of Seller, no Person has infringed upon, misappropriated, diluted or otherwise violated, or is currently infringing upon, misappropriating, diluting, or otherwise violating any Purchased Intellectual Property, and no such claims are pending or threatened in writing against any Person by Seller or have been made by Seller against any Person since January 1, 2022.

(g)     Seller has, with respect to the Business, taken commercially reasonable measures, including actions common in the industry, to maintain, protect, preserve and enforce the Trade Secrets included in the Purchased Intellectual Property and other confidential or proprietary information relating to the Business, including by requiring all Persons having access thereto to execute binding, enforceable, written non- disclosure Contracts and implementation and maintenance of appropriate and reasonable security measures.

(h)     To the Knowledge of Seller, no current or former employee, consultant, or independent contractor of Seller is in violation (in any material respect) of (i) Seller's policies or any agreement regarding maintaining the confidentiality of Trade Secrets or other confidential or proprietary information or Intellectual Property Rights or (ii) any applicable non-competition or non-solicitation restrictive covenant.

(i)     Schedule 3.8(i) sets forth a true, correct and complete list of (i) all Business Software owned by Seller, and (ii) all Software (other than Open Source Materials listed in Schedule 3.8(i)(iii)) that is incorporated or embedded in or bundled with any Business Software, (iii) all Open Source Materials that are or have been included, incorporated or embedded in, linked to, combined or distributed with, or used in the delivery or provision of any Business Software or other Business product, service or offering, and (iv) all Software (including Business Software) within the Licensed Intellectual Property, other than commercial "off-the-shelf" Software licensed on standardized terms from third parties with a replacement cost and/or aggregate annual license and maintenance fee payable by Seller of less than $5,000, and including, for each item listed with respect to clauses (ii), (iii) and/or (iv) of Schedule 3.8(i), the name of the licensor or owner of the Software.

(j)     The computer systems, including Software, hardware, networks,

25

databases, systems, telecommunications equipment and websites (and all information transmitted thereby or stored therein), owned, leased, licensed or otherwise used or held for use by Seller in the conduct of the Business (collectively, the "Business Systems") are reasonable for the Business as currently conducted and as currently proposed to be conducted. Seller has implemented and maintains commercially reasonable security and maintenance and support procedures and facilities and disaster recovery and business continuity plans (including periodic testing on at least an annual basis of such disaster recovery and business continuity plans) that comply with applicable Law to ensure the physical and electronic protection of the Business Systems from material disruptions in operation or unauthorized disclosure, use or modification. There has not been any material failure with respect to the Business Systems that has not been remedied or replaced in all material respects. There have been no violations, intrusions or breaches of the Business Systems.

(k)     With respect to the Business, Seller complies and has complied (and, to the extent required by Applicable Privacy and Data Security Law, requires the compliance of all of its vendors which have access to Personal Information relating to the Business and collected or controlled by Seller) with (i) all applicable Privacy and Data Security Laws with respect to the collection, possession, maintenance, transfer or use of Personal Information; (ii) any applicable and published data security and privacy policies or related policies, programs or other notices of Seller relating to Seller's collection, possession, maintenance, transfer or use of Personal Information in the conduct of the Business; and (iii) contractual obligations to which Seller is a party relating to data security, privacy, or the collection or retention of Personal Information, in each case in connection with the conduct of the Business.  As of the date hereof, Seller has not received any written notice, complaint or claim from any Person alleging violation of any Applicable Privacy and Security Law or contract, and no Governmental Authority has served any subpoenas, demands or other written notices on Seller alleging a violation of any Applicable Privacy and Security Law in connection with the conduct of (or otherwise related to) the Business.

(l)     With respect to the Business, Seller posts all policies with respect to the matters set forth in Section 3.8(k) on its websites, mobile applications, SMS text applications, and other communications channels in conformance with, and to the extent required by, Applicable Privacy and Data Security Laws.

Section 3.9     Compliance with Laws and Court Orders.  Seller is, and since January 1, 2022 has been, in compliance, in all material respects, with all Laws applicable to Seller, including the ownership, operation and use of the Purchased Assets and the Assumed Liabilities and, since January 1, 2022, the Company has not received any written (or, to the Knowledge of Seller, oral) notice of any action or other Legal Proceeding against it alleging any failure to comply in any respect with any such Laws. No investigation by any Governmental Authority with respect to Seller's ownership, operation and use of the Purchased Assets is pending or, to the Knowledge of Seller, threatened, and since January 1, 2022, Seller has not received any written (or, to the Knowledge of Seller, oral) notice of any such investigation.

Section 3.10     Environmental Matters. Except as set forth on Schedule 3.10:

(a)     Seller (i) is and has at all times since January 1, 2022, been in compliance in all material respects with all applicable Environmental Laws with respect to the Leased Real Property, the Business and the Purchased Assets; (ii) has held since January 1, 2022, and is and has at all times since January 1, 2022 been in compliance in all material respects with, all Environmental Permits required in connection with the Leased Real Property, the Business and the Purchased Assets; and (iii) has not, since January 1, 2022, received any written notice that any material Environmental Permits will be voided, canceled or withdrawn or will not be renewed.

(b)     Since Seller's occupation of the Leased Real Property, there has been no Release of Hazardous Substances on, in, at, under or from any of the real property associated with the Leased Real Property, or any of the Improvements thereon, or otherwise in connection with the Business or the Purchased Assets.

(c)     With respect to the Leased Real Property, the Business and the Purchased Assets, (i) neither Seller nor, to the Knowledge of Seller, any other Person has treated, recycled, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or Released any Hazardous Substances, and (ii) no real property owned, leased, subleased, occupied, or operated by Seller has been contaminated by any Hazardous Substance, in each case, in a manner that has given or would reasonably be expected to give rise to a material Liability to Seller under any Environmental Law.

(d)     Seller has not retained or assumed by Contract or operation of Law, any Liability of any third party under Environmental Law.

Section 3.11     Employee Benefit Plans.

(a)     Schedule 3.11(a) sets forth a complete and accurate list of all material Employee Benefit Plans. Seller has provided to, or made available to, Purchaser true and correct copies of each material Employee Benefit Plan (including all plan documents and amendments thereto).

(b)     Each Employee Benefit Plan has been established, maintained, funded and administered in material compliance with its terms and all applicable requirements of ERISA, the Code, and other applicable Laws and there has been no written notice issued by any Governmental Authority questioning or challenging such compliance. There are no Legal Proceedings (other than non-material routine claims for benefits) pending, or, to the Knowledge of Seller, threatened involving any such Employee Benefit Plan or the assets of any such Employee Benefit Plan, in each case, that could reasonably be expected to impact in any material respect any Business Employee or the Business or result in any material Liability to Purchaser.

(c)     (i) Neither Seller nor any of its Affiliates are a party to or bound by any union collective bargaining agreements or other labor contracts covering any Business Employee; (ii) neither Seller nor any of its Affiliates are experiencing or have experienced in the five (5) years prior to the date of this Agreement, any material labor disputes or work stoppages due to labor disputes in connection with the business and operations and there is not currently, and has not been in the five (5) years prior to the date of this Agreement, any labor strike, dispute, slow down or stoppage actually pending or, threatened against Seller; (iii) neither Seller nor any of its Affiliates have in the five (5) years prior to the date of this Agreement engaged in any unfair labor practices within the meaning of the National Labor Relations Act with respect to its employees or other individuals who provide services that support the business and operations; (iv) neither Seller nor any of its Affiliates have in the ninety (90) days preceding the date of this Agreement implemented any layoffs, plant closings or shutdowns as defined under the WARN Act; and (v) there are no pending or, to the Knowledge of Seller, threatened employment discrimination, employee health and safety, unfair labor practice, wage and hour, unemployment compensation, worker's compensation, immigration, union grievance or other employment-related claims, citations, proceedings or, to the Knowledge of Seller, investigations or allegations against Seller involving any Business Employee.

(d)     Schedule 3.11(d) sets forth a list of all Business Employees, including the

27

following information, to the extent permitted by applicable Law: (i) title or job/position, (ii) job designation (*i.e.*, salaried or hourly), (iii) location of employment, (iv) employment status (active or on leave or furlough), (v) date of hire, (vi) status as full- or part-time, (vii) rate of pay and most recent bonus amount, and (viii) accrued and unused paid time off. Seller has consent from each of the Business Employees to share with Purchaser the data and Personal Information set forth on Schedule 3.11(d) regarding such Business Employees.

Section 3.12    Title to Properties; Condition of Assets; Inventory.

(a)    Subject to requisite Bankruptcy Court approvals, Seller has or will have as of immediately prior to the Closing good, transferable, indefeasible, marketable and valid title to, or a valid leasehold interest in, all of the Purchased Assets. On the terms and subject to the conditions set forth in this Agreement, and subject to the Sale Order having been entered, at the Closing Seller shall Transfer, or cause to be Transferred, to Purchaser (and which Transfer(s) shall be in accordance with the Sale Order) all right, title and interest of Seller as of the Closing Date in and to all Purchased Assets (for clarity, excluding in each case the Excluded Assets) in accordance with the Sale Order and free and clear of all Liens, other than Permitted Liens.

(b)    Except as set forth on Schedule 3.12(b): (i) the buildings, equipment and other tangible personal property comprising the Purchased Assets are, in all material respects, in good operating condition and repair, free of defects and in a state of good maintenance (ordinary wear and tear excepted in each case), and (ii) the Inventory, taken as a whole, consists of a quality and quantity salable in the Ordinary Course of Business in all material respects, except for obsolete, damaged or defective items that have been written off or written down to fair market value or for which adequate reserves have been established by Seller in the Ordinary Course of Business.

(c)    The Purchased Assets constitute all of the property and assets used in or necessary for the conduct of the Business substantially as conducted as of the date hereof and as of the Closing in all material respects, except for any Business Employees that do not become Transferred Employees.

Section 3.13    Real Property.

(a)    The Leased Real Property set forth on Schedule A constitutes all of the real property (whether leased, subleased, licensed or otherwise occupied) used by Seller in connection with the Business as presently conducted. Subject to the disclosures set forth on Schedule 3.13(e), Seller has a valid and enforceable leasehold estate, or subleasehold estate, as applicable, in, and enjoys peaceful and undisturbed possession of, all Leased Real Property, free and clear of all Liens, other than Permitted Liens, subject to the application of any bankruptcy Laws, other similar Laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies.

(b)    Seller does not own, and, since January 1, 2022, has not owned, a fee interest in any real property.

(c)    A true, correct and complete list of each Leased Real Property and security deposit delivered to the landlord with respect thereto is attached hereto as Schedule 3.13(c). Seller has delivered (or otherwise made available) to Purchaser a true, correct and complete copy of each written or oral lease, sublease, license, concession or other occupancy agreement, including all amendments, modifications, assignments, extensions, renewals, supplements, written notices or memoranda, guaranties, terminations, surrenders, subordination, non-disturbance and attornment

28

agreements and other agreements related thereto (it being understood that, with respect to any oral arrangements, Seller has delivered (or otherwise made available) a true, correct and complete summary thereof), to which Seller is a party, by which it is bound or pursuant to which Seller occupies any Leased Real Property (individually, a "Real Property Lease" and collectively, the "Real Property Leases"). Each Real Property Lease is unmodified and represents the entire agreement between Seller and the applicable landlord.

(d)     Except as set forth on Schedule 3.13(d), (i) there are no written or oral leases, subleases, licenses, concessions, occupancy agreements or other Contracts to which Seller is a party granting to any other Person (other than Seller) the right of use or occupancy of any of the Leased Real Property, (ii) there is no Person (other than Seller) in possession of any of the Leased Real Property, and (iii) there are no outstanding options or rights of first refusal granted by Seller (or, to the Knowledge of Seller, any predecessor-in- interest of Seller pursuant to a Contract to which Seller is a party) granting any other Person the right to purchase or lease any Leased Real Property or any portion thereof or interest therein. With respect to each Real Property Lease that is a sublease, to the Knowledge of Seller, the representations and warranties in this Section 3.13(d) are true and correct with respect to the underlying lease.

(e)     Except as set forth on Schedule 3.13(e), with respect to each Real Property Lease: (i) such Real Property Lease is valid, binding, enforceable and in full force and effect (except (A) as enforcement may be limited by the Enforceability Exceptions and (B) insofar as the availability of equitable remedies may be limited by applicable Law); (ii) upon the entry of the Sale Order and the execution by landlords, Seller, and Purchaser of the Novated Leases, as of the Closing, Seller will not be in material breach or default thereunder; (iii) all work required to be performed under such Real Property Lease by Seller has been performed and, to the extent that Seller is responsible for the payment of such work, has been fully paid for, whether directly to the contractor performing such work or to the landlord as reimbursement therefor; (iv) Seller has not assigned, subleased, mortgaged, deeded in trust or otherwise transferred or encumbered any Real Property Lease or Leased Real Property or any interest therein (or entered into any outstanding contracts for any of the foregoing); and (v) Seller has not received or delivered any written notice terminating any Real Property Lease.

(f)     Seller has not received any written notice of any pending or threatened condemnation proceedings in connection with any parcel of Leased Real Property. Seller's and the Business' current use of the Leased Real Property does not violate, in any material respect, any restrictive covenant of record that affects any of the Leased Real Property. Seller has not received (and to the Knowledge of Seller there does not exist) any written notice issued with respect to any pending or contemplated changes in any applicable legal requirements (or other Law) which might adversely affect the use, operation or maintenance of the Leased Real Property.

(g)     Each Leased Real Property is supplied with utilities and other services necessary for the operation of such Leased Real Property as the same is currently operated or currently contemplated to be operated. As of the date hereof, each Leased Real Property is in good operating condition and repair, ordinary wear and tear excepted, in all material respects. The Improvements constructed at each Leased Real Property, including all leasehold Improvements owned or leased by Seller or otherwise operated in connection with the Business, are sufficient for the operation of the Business as presently conducted.

(h)     Seller is not party to any agency or brokerage agreements, and there are no brokerage or other leasing commissions due or payable by Seller on an absolute or contingent basis to any Person in connection with any real property, including the Real Property Leases (and

29

amendments, extensions or renewals of existing Real Property Leases or exercise of any rights or options thereunder).

(i)  Except as set forth on Schedule 3.13(i), Seller has paid all rental, utility and any additional charge payments with respect to each Real Property Lease, which are due and payable on or prior to Closing, and no rental, utility and additional charge payments with respect to each Real Property Lease is currently unpaid or disputed.

Section 3.14  Contracts.  As part of the Petition in the Bankruptcy Case, Seller filed the Contracts List. The Contracts List includes all Contracts to which Seller is a party and which may be assumed or rejected under Section 365 of the Bankruptcy Code and Seller's good faith calculation of the Cure Costs. Seller served the Contracts List on each of the counterparties to the Contracts in accordance with the Bankruptcy Code and the Bankruptcy Rules. Except as set forth on Schedule 3.14 with respect to each Assumed Contract, and except as would not reasonably be expected to have a material and adverse effect on the Business, the Assumed Liabilities or the Purchased Assets: (a) upon the entry of the Sale Order, as of the Closing, Seller will not be in default or breach with respect to any such Contract; (b) to the Knowledge of Seller, as of the date hereof, no third party is in default or breach with respect to any obligations to be performed under any such Contract; (c) as of the date hereof such Contract is valid, binding and in full force and effect, enforceable against Seller and, to the Knowledge of Seller, enforceable against the other party or parties thereto, in each case, in accordance with the terms thereof (except (i) as enforcement may be limited by the Enforceability Exceptions and (ii) insofar as the availability of equitable remedies may be limited by applicable Law); and (d) as of the date hereof, neither Seller nor, to the Knowledge of Seller, any third party has repudiated or waived any provision of, or rights under, any such Contract or in any way modified (in any respect) any of the terms thereof (including cancellation or termination of any such Contract). Seller has made available to Purchaser or its Representatives true, complete and correct copies of all Contracts (including any amendments thereto). No Contract to which Seller is party restrains, restricts, limits or impedes, in each case in any material respect, the ability of Seller or the Business to compete with or conduct any business or line of business in any geographic area.

Section 3.15  Insurance. Schedule 3.15 sets forth a true and complete list of the insurance policies (collectively, the "Insurance Policies") maintained by Seller with respect to the Business, Purchased Assets and/or the Assumed Liabilities as of the date hereof; provided that, for clarity, the term "insurance policy" shall not include any policies of insurance that fund or relate to any Employee Benefit Plan. Seller has made available to Purchaser or its Representatives true, complete and correct copies of all such Insurance Policies. As of the date hereof, Seller (or one (1) or more of Seller's Affiliates) maintains all insurance required under the Real Property Leases, except for such failure to maintain insurance that would not reasonably be expected to be, individually or in the aggregate, material to the Real Property Leases. Each of the Insurance Policies is in full force and effect and all premiums due thereon as of the date hereof have been paid. As of the date hereof, Seller has not received any written notice regarding (a) a termination or material reduction of coverage with respect to any Insurance Policy, (b) a refusal of any coverage or rejection of any claim under any Insurance Policy, (c) a change in coverage of any Insurance Policy, (d) a premium audit with respect to any Insurance Policy, or (e) an increase in the amount of the premiums payable with respect to any Insurance Policy. Seller is not in default under, or has otherwise failed to comply with, any material provision contained in any Insurance Policy.

Section 3.16  Financial Statements.

(a)  Seller has made available to Purchaser copies of the following financial information (collectively, the "Financial Statements"): (i) Seller's compiled balance sheets as of December 31, 2022 and December 31, 2023 and consolidated statements of income and cash flows for the fiscal years ended December 31, 2022 and December 31, 2023, and Seller prepared balance

30

sheet as of December 31, 2024 and statement of income and cash flow for the fiscal year ended December 31, 2024 (such balance sheets and statements of income and cash flows collectively, the "Historical Financial Statements"), together with all related notes and schedules thereto, (ii) Seller's unaudited balance sheet as of August 31[2], 2025 (such date, the "Interim Balance Sheet Date") and unaudited statements of income and cash flows for the eight (8) month period ending on August 31, 2025 (collectively, the "Interim Financial Statements"), (iii) the dollar amount of the Inventory as of the date hereof as determined in accordance with the valuation methodology set forth on Schedule 2.6(c) broken out by ISBN and location (whether store or warehouse) ("Signing Date Inventory Amount"), and (iv) a statement of all Gift Card liabilities as of the twelve (12) month periods ended on December 31, 2022, December 31, 2023 and December 31, 2024 and the eight (8) month period ended on August 31, 2025. Each of the Financial Statements (w) has been prepared in accordance with GAAP, consistently applied throughout the periods indicated (except as may be indicated in the notes thereto), (x) fairly presents, in all material respects, the financial position, results of operations and cash flows of Seller for such periods except as otherwise noted therein and subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments and the absence of notes, (y) is derived from and is consistent, in all material respects, with the books and records of Seller (which are correct and complete in all material respects) and (z) is true, complete and correct in all material respects.

(b)     All Accounts Receivable (i) represent monies due for goods sold and delivered or services rendered, in each case, in the Ordinary Course of Business, (ii) are free and clear of all defenses and claims of any nature whatsoever other than claims for warranties and claims made in the Ordinary Course of Business that are not material in the aggregate, are valid and enforceable claims, are subject to no set-off or counterclaim and are current and fully collectible in the Ordinary Course of Business. Since January 1, 2025, Seller has collected the Accounts Receivable in the Ordinary Course of Business and in a manner which is consistent with past practices of the Business and has not accelerated any such collections.

Section 3.17     Absence of Certain Developments. Since January 1, 2025, and other than the commencement of the Bankruptcy Case, (a) the Business has been operated in the Ordinary Course of Business and (b) there has not been any event, occurrence, condition, development, change, circumstance or state of facts that has had or would reasonably be expected to have, a Material Adverse Effect.

Section 3.18     Material Suppliers. Schedule 3.18 sets forth a list of the top twenty (20) suppliers of the Business by top open volume for the eight (8) month period ended on August 31, 2025, and the twelve (12) month period ended on December 31, 2024, as well as the corresponding dollar volume for each such period (collectively, the "Material Suppliers").

Section 3.19     Affiliated Transactions. Except as set forth on Schedule 3.19, to the Knowledge of Seller, no Related Party (a) is a party to any Contract or transaction involving the Business other than (i) loans and other extensions of credit to directors and officers of Seller (and/or the Business) for travel or business expenses or other employment-related purposes in the Ordinary Course of Business, none of which are material, individually or in the aggregate and (ii) employment arrangements, or (b) owns, directly or indirectly, any interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a material supplier, lessor, lessee, competitor of the Business, or any other Person with a material commercial relationship with the Business or material asset used by the Business.

Section 3.20     Taxes. Except as set forth on Schedule 3.20:

---

[2] **NTD**: To be rolled over to the following month if necessary.

4908-6398-5148, v. 17

(a)     Seller has timely filed all Tax Returns in respect of the Business and/or the Purchased Assets required to be filed with the appropriate Governmental Authority. All such Tax Returns are true, complete and correct in all respects and were prepared in compliance with all applicable Laws. All Taxes relating to the Business and/or the Purchased Assets that are due and payable, whether or not shown to be payable on such Tax Returns, have been or will be timely paid before or at the Closing. No examination of any such Tax Return is currently in progress by any Governmental Authority and, as of the date hereof, Seller has not received written notice of any contemplated examination of any such Tax Return and no adjustment has been proposed in writing with respect to any such Tax Returns by any Governmental Authority.

(b)     Seller has not agreed to any waiver or extension of any statute of limitations in respect of Taxes with respect to the Business and/or the Purchased Assets. As of the date hereof, there are no pending (or, to the Knowledge of Seller, threatened in writing) audits, investigations, disputes, written notices of deficiency, claims or other Legal Proceedings for or relating to any liability for Taxes relating to the Business and/or the Purchased Assets.

(c)     Seller is not a party to any "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local or foreign Law) or any other agreement with any Governmental Authority with respect to Taxes relating to the Business and/or the Purchased Assets. Seller has no outstanding requests for a private letter ruling or technical advice memoranda or similar rulings with any Governmental Authority, and no such rulings are in effect, with respect to Taxes relating to the Business and/or the Purchased Assets.

(d)     As of the date hereof, Seller is not in default under, nor does there exist any condition which, with the giving of notice or passage of time, would constitute a default by Seller under any agreement with any Governmental Authority that provides for or results in a reduction, rebate or exemption from Taxes or any other form of Tax incentive applicable to the Business and/or the Purchased Assets.

(e)     Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party (in each case, to the extent related to the Business and/or the Purchased Assets) and all IRS Forms W-2 and Forms 1099 (or any other applicable Tax forms) required with respect thereto have been properly and timely distributed.

(f)     Seller is not a party to any Tax allocation, Tax indemnification or Tax sharing agreement. Seller (i) has not been a member of an affiliated group filing a consolidated federal income Tax Return (other than any group the common parent of which was Parent), and (ii) does not have liability for the Taxes of any Person under Treasury Regulation 1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by Contract (other than a commercial contract entered into in the Ordinary Course of Business the primary purpose of which is unrelated to Tax), or otherwise.

(g)     Seller is not and has never been a party to any "listed transaction," as defined in Section 6707A(c)(2) of the Code and Treasury Regulation 1.6011-4(b)(2).

(h)     No claim has been made in writing by any Governmental Authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction with respect to the Business and/or Purchased Assets.

(i)     No power of attorney with respect to Taxes relating to the Business and/or the Purchased Assets has been executed or filed with any Governmental Authority by or on behalf

of Seller that will remain in effect after the Closing Date.

(j) Seller has, with respect to the Business and/or the Purchased Assets, properly (i) collected and remitted sales and similar Taxes with respect to sales made to its customers, and (ii) for all sales that are exempt from sales and similar Taxes that were made without charging or remitting sales or similar Taxes, received and retained any appropriate Tax exemption certificates and other documentation qualifying such sale as exempt.

(k) As of the date hereof, other than as set forth on Schedule 3.20(k), there are no Liens for Taxes on any of the Purchased Assets or the Business, other than Permitted Liens.

Section 3.21    Certain Fees. Except as set forth on Schedule 3.21, Seller has not employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

Section 3.22    Bank Accounts. Except as set forth on Schedule 3.22, Seller does not own or have rights to any other bank accounts.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Subject to the terms, conditions and limitations set forth in this Agreement, Purchaser hereby represents and warrants to Seller as of the date of this Agreement and as of the Closing as follows:

Section 4.1    Organization. Purchaser is a limited liability company validly existing under the Laws of Delaware and has the power and authority to carry on in all material respects its business as now being conducted. Purchaser is duly licensed or qualified to transact business and is in good standing in each jurisdiction in which the operation of its business as currently conducted makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not prevent or otherwise have a material adverse effect, individually or in the aggregate, on Purchaser's ability to consummate the Transactions.

Section 4.2    Due Authorization. Subject to the entry of the Sale Order, the execution, delivery and performance by Purchaser of this Agreement and each Transaction Document to which it is a party and the consummation of the Transactions are within the limited liability company powers of Purchaser and have been duly and validly authorized by all necessary actions on the part of Purchaser. Subject to the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document to which Purchaser is a party will when executed constitute, assuming each such agreement constitutes a valid and binding agreement of Seller, a legal, valid and binding agreement of Purchaser that is enforceable in accordance with its terms, except as such enforceability may be limited by the Enforceability Exceptions.

Section 4.3    Governmental Authorization. Subject to entry of the Sale Order, the execution, delivery and performance by Purchaser of this Agreement and each Transaction Document to which it is a party and the consummation of the Transactions by Purchaser require no action by or in respect of, notification to, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court and (b) such actions and filings required pursuant to Section 7.4.

Section 4.4    Noncontravention. Subject to the entry of the Sale Order, the execution, delivery and performance by Purchaser of this Agreement and each Transaction Document to which it is a party and the consummation of the Transactions do not and will not (a) violate Purchaser's Organizational

33

Documents; (b) assuming compliance with the matters referred to in <u>Section 4.3</u>, constitute or result in a default under or violate any applicable Law; or (c) constitute a breach or a default under (or event which, with the giving of notice or lapse of time, or both, would become a default) or give rise to any right of termination, amendment, revocation, suspension, payment, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound.

Section 4.5  <u>Litigation</u>. As of the date hereof, there are no Legal Proceedings pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any Governmental Authority which would, or would reasonably be likely to prevent, enjoin, alter or materially delay, or otherwise have a material adverse effect, individually or in the aggregate, on Purchaser's ability to consummate the Transactions.

Section 4.6  <u>Certain Fees</u>. Purchaser has not employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions, in each case, for which fees Seller may be liable.

ARTICLE V
COVENANTS OF SELLER

Section 5.1  <u>Conduct of the Business</u>. Seller agrees that:

(a)  From the date hereof until the earlier of the termination of this Agreement pursuant to <u>Section 12.1</u> and the Closing Date, except (i) as explicitly required by applicable Law, (ii) as explicitly required by the Bankruptcy Court, or (iii) as explicitly required by this Agreement, Seller agrees to (A) conduct the Business and the operation thereof (including the E-Commerce Platform) in the Ordinary Course of Business, (B) pay all applicable Taxes as such Taxes become due and payable, (C) to ensure that each Leased Real Property is maintained in good operating condition and repair, ordinary wear and tear excepted, in all material respects, and (D) timely perform its obligations under the Purchased Contracts.

(b)  From the date hereof until the earlier of the termination of this Agreement pursuant to <u>Section 12.1</u> and the Closing Date, except (i) as explicitly required by applicable Law, (ii) as explicitly required by the Bankruptcy Court, (iii) as explicitly required by this Agreement, Seller will not:

(i)  acquire (by merger, consolidation, acquisition of stock or assets, or otherwise) any corporation, partnership, joint venture, association or other business organization or division thereof, or substantially all of the assets of any of the foregoing or any other material assets (excluding Inventory in the Ordinary Course of Business);

(ii)  sell, lease, license, Transfer, encumber (or permit to become subject to a Lien, other than a Permitted Lien) or otherwise dispose of any Purchased Assets, except for Inventory sold, leased, licensed, Transferred, encumbered or otherwise disposed of in the Ordinary Course of Business;

(iii)  subject any Purchased Assets to any Liens, other than Permitted Liens;

34

(iv)     fail to maintain and keep in full force and effect all existing Insurance Policies, other than (A) expiration of insurance policies that expire by their terms (in which event Seller shall use commercially reasonable best efforts to renew or replace such insurance policies with insurance policies offering commensurate levels of coverage) or (B) immaterial changes to such insurance policies made in the Ordinary Course of Business;

(v)     demolish or remove any Improvement on the real property associated with any Assumed Lease or erect material Improvements on the real property associated with any Assumed Lease (or any portion thereof);

(vi)     enter into, amend, modify or renew any Contract with any Related Party;

(vii)     cancel or compromise any material debt or claim or waive or release any material right, in each case, that is a Purchased Asset or Assumed Liability; or

(viii)     agree or commit to do any of the foregoing.

Section 5.2     Access to Information.

(a)     From the date hereof until the earlier of the termination of this Agreement pursuant to Section 12.1 and the Closing Date, Seller shall reasonably afford, and shall cause its Representatives to reasonably afford, to Purchaser and its Representatives, reasonable access (at reasonable times during regular business hours and upon reasonable advance written notice) to all books, records, personnel, officers and other facilities of Seller (unless solely related to the Excluded Assets or Excluded Liabilities); provided that any such access shall be conducted at Purchaser's expense (solely with respect to reasonable, documented out-of-pocket expenses, and excluding overheads), in accordance with applicable Law (including the Bankruptcy Code), under the supervision of Seller's personnel and in such a manner as to maintain confidentiality and not to unreasonably interfere with the normal operations of Seller or the Business.

(b)     Notwithstanding anything to the contrary contained in this Agreement, neither Party shall have any obligation to make available to the other Party or its Representatives, or to provide the other Party or its Representatives with access or copies to information to the extent that such first Party determines, in its reasonable judgment, that making such information available would jeopardize any attorney-client privilege, the work product immunity or any other legal privilege or similar doctrine; provided that such first Party shall use its reasonable best efforts in cooperating with any requests for, and use reasonable best efforts to obtain any, waivers that would enable any otherwise required disclosure to the other Party to occur without so jeopardizing any such privilege or immunity.

Section 5.3     Cooperation with Purchaser. From the date hereof until the earlier of the termination of this Agreement pursuant to Section 12.1 and the Closing Date, Seller and Purchaser shall each use commercially reasonable efforts, and shall reasonably and in good faith cooperate, assist and consult with each other, to secure the entry of the Sale Order (a) approving this Agreement, (b) authorizing the sale of the Purchased Assets pursuant to Sections 363 and 365 of the Bankruptcy Code, (c) authorizing the assumption and assignment of the Purchased Contracts pursuant to Section 365 of the Bankruptcy Code, and (d) authorizing the Transactions. In connection with the assumption and assignment of the Purchased Contracts pursuant to Section 365 of the Bankruptcy Code, Purchaser shall take all necessary actions reasonably requested by Seller to assist in obtaining a Bankruptcy Court finding that there has been an

35

adequate demonstration of "adequate assurance of future performance" by Purchaser under the Purchased Contracts after the Closing. Seller and Purchaser shall consult with one another in good faith and shall provide reasonable advance notice and proposed drafts to the extent reasonably practicable of all pleadings that either of them intends to file, or positions either of them intends to take, with the Bankruptcy Court in connection with or that might reasonably affect the Bankruptcy Court's entry of the Sale Order.

Section 5.4    Bankruptcy Action.

(a)    Seller shall: (i) obtain entry of the Sale Order by no later than the Sale Order Deadline Date, and (ii) consummate the Closing on or before the End Date.

(b)    Seller shall comply in all material respects with all of the obligations of Seller under the Sale Order (after the entry of such Order by the Bankruptcy Court). The Sale Order shall be in form and substance satisfactory to Purchaser.

(c)    Seller shall use reasonable efforts to comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code in connection with obtaining approval of the Transactions. Seller shall serve on all required Persons in the Bankruptcy Case, including (i) all Persons who are known to possess or assert a Claim against or interest in any of the Purchased Assets, (ii) the Internal Revenue Service, (iii) all applicable Governmental Authorities (including all applicable state, local and non-U.S. Governmental Authorities with taxing authority), (iv) all other Persons required by any Order of the Bankruptcy Court, (v) all counterparties to Contracts and Real Property Leases, and (vi) any other Persons that Purchaser reasonably may request in writing that Seller serve such notice (and Seller shall use commercially reasonable efforts to serve such Persons who are the subject of this clause (vi)), in each case, any notice of the Sale Motion, the Sale Hearing, the Sale Order, and all objection deadlines in accordance with the Bankruptcy Code, and any applicable local or other rules of the Bankruptcy Court.

Section 5.5    Sale Order. The Sale Order shall, among other things: (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement and the Transaction Documents, (ii) the sale of the Purchased Assets to Purchaser on the terms set forth herein and free and clear of all Liens to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code (other than Permitted Liens), and (iii) the performance by Seller of its obligations under this Agreement and the Transaction Documents; (b) authorize and empower Seller to assume and assign to Purchaser the Purchased Contracts; (c) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code; (d) find that Purchaser has not violated Section 363(n) of the Bankruptcy Code by any action or inaction; and (e) provide for the transfer of the Claims and rights referenced in Section 2.1(r) of this Agreement, to Purchaser. Each of Seller and Purchaser agrees that such Party will promptly take such actions as are reasonably requested by the other Party to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of: (A) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (B) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

Section 5.6    Other Bankruptcy Matters. Seller acknowledges that this Agreement and the sale of the Purchased Assets and the assumption and assignment of the Purchased Contracts are subject to Bankruptcy Court approval. Seller and Purchaser acknowledge that (a) to obtain such approval, Seller must demonstrate that it has taken commercially reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration shall include giving notice of the

36

Transactions to interested parties as ordered by the Bankruptcy Court, and (b) Purchaser must provide adequate assurance of future performance under the to-be-assigned Purchased Contracts.

Section 5.7 <u>Receipt of Property Relating to Assets</u>. If, following the Closing, Seller (or its Affiliates or Representatives) receives any money, check, note, draft, instrument, payment or other property as proceeds of the Purchased Assets or any part thereof, each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Purchaser and, up on receipt thereof, shall notify Purchaser in writing of such receipt and shall remit the same (or cause the same to be remitted) to Purchaser in the manner specified by Purchaser.

~~Section 5.8 Customer Loyalty Program Consents. Upon execution of this Agreement, Seller shall notify all customers whose personal information is currently held by Seller and request that such customers consent to the transfer of such personal information to Purchaser as part of the Transaction (the "Consent Notice") prior to the Closing. The Consent Notice shall be in writing and in a form and substance mutually agreeable to both Seller and Purchaser. For a period up to [twelve (12) months] after Closing, Seller shall maintain a list of all Customer Loyalty Program members who have not given their affirmative consent to the transfer of their Personal Information to Purchaser prior to Closing. Subject to evidence of receipt of such consent from Purchaser or any service provider engaged in the collection of opt-ins from such customers after Closing, Seller shall transfer to Purchaser all account details, including, without limitation, email addresses, telephone numbers and any recorded marketing and opt in/out preferences for such customers, to advise all cumulated benefits of each member to date as of immediately prior to the Closing Date.~~

~~Section 5.9~~Section 5.8 <u>Confidentiality Obligations of Seller</u>. In further consideration for the payment of the consideration contemplated by this Agreement and in order to protect the value of the Business and Purchased Assets purchased by Purchaser, upon the Closing, Seller agrees that, as an owner of the Business, Seller has had access to and contributed to information and materials of a highly sensitive nature (including Confidential Information) of Seller and the Business. Seller agrees that unless it first secures the written consent of an authorized representative of Purchaser, none of Seller nor any of its Affiliates or Representatives shall use, for themselves or anyone else, and shall not disclose to others, any Confidential Information, except to the extent such use or disclosure is required by applicable Law or any Order (in which event Seller shall, to the extent practicable, inform Purchaser in advance of any such required disclosure, shall cooperate with Purchaser (at Purchaser's sole expense) in all reasonable ways in obtaining a protective Order or other protection in respect of such required disclosure, and shall limit such disclosure to the extent reasonably possible while still complying with such requirements). Seller shall, and shall cause its Affiliates to, use the same standard of care to maintain the confidentiality of Confidential Information following the Closing as Seller uses to maintain its other confidential, non-public information, but in any event at least reasonable care.

Section 5.~~10~~9 <u>Acknowledgement</u>. Seller acknowledges and represents that: (a) sufficient consideration has been given by each Party to the other Parties as it relates hereto and the covenants, obligations and agreements under this <u>Article V</u> were taken into account in determining the amount of such consideration; (b) Seller has consulted with independent legal counsel regarding its rights and obligations under this <u>Article V</u>; (c) Seller fully understands the terms and conditions contained herein; (d) the restrictions and agreements in this <u>Article V</u> are reasonable in all respects and, as applicable, necessary for the protection of the Business and the Purchased Assets and that, without such protection, the customer and client relationships and competitive advantage relating to the Business would be materially adversely affected; and (e) the agreements in this <u>Article V</u> are an essential inducement to Purchaser to enter into this Agreement and they are in addition to, rather than in lieu of, any similar or related covenants to which Seller is party or by which it is bound.

## ARTICLE VI
## COVENANTS OF PURCHASER AND SELLER

Purchaser and Seller agree that:

Section 6.1    Efforts; Further Assurances. Subject to the terms and conditions of this Agreement, the Bankruptcy Code and any Orders of the Bankruptcy Court, Purchaser and Seller will each use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, and cooperate with each other with respect to all things necessary or desirable under applicable Laws to consummate the Transactions, including to vest in Purchaser all of Seller's right, title and interest to the Purchased Assets, free and clear of all Liens other than Permitted Liens and Assumed Liabilities. Seller and Purchaser agree to execute and deliver such other documents, certificates, agreements, instruments, and other writings and to take such other actions as may be necessary or desirable in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

Section 6.2    Certain Filings. Seller and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Purchased Contracts or any Intellectual Property Rights included in the Purchased Assets, in connection with the consummation of the Transactions, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers. Each Party shall, as promptly as possible, (i) make, or cause to or to be made, all filings and submissions required under any Law applicable to such Party or any of its Affiliates; and (ii) use reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities, in each case, that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement.

Section 6.3    Public Announcements. Except as required by Law or in connection with the Bankruptcy Case (based upon the reasonable advice of counsel), neither Seller (or Parent) nor Purchaser shall issue any press release or public announcement or statement concerning this Agreement or the Transactions without obtaining the prior written consent of the other Party (not to be unreasonably withheld, delayed or conditioned) and the Parties shall cooperate as to the timing and contents of any such announcement.

Section 6.4    Notice of Certain Matters. Prior to the Closing each Party shall promptly notify the other of any Legal Proceeding that shall be instituted or threatened against such Party to restrain, prohibit or otherwise challenge the legality of the Transactions. Seller shall promptly notify Purchaser, and Purchaser shall promptly notify Seller, of any Legal Proceeding or investigation that may be threatened, brought, asserted or commenced against the other which would have been listed in Schedule 3.6 or would be an exception to Section 3.6 if such Legal Proceeding or investigation had arisen prior to the date hereof.

Section 6.5    Access. On and after the Closing Date, upon reasonable advance notice, Purchaser and Seller will afford promptly to such other requesting Party and its Representatives reasonable access during normal business hours to their respective properties, books, records (in each case, to the extent related to any period prior to the Closing Date), employees, auditors and counsel (i) to the extent necessary for financial reporting and accounting matters, employee benefits matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, claim or assessment, the reconciliation of Claims in the Bankruptcy Case or otherwise to enable Purchaser or Seller, as applicable, to address issues arising in connection with or relating to the Bankruptcy Case, or (ii) to permit Purchaser or Seller, as applicable, to determine any matter relating to their rights and obligations under this Agreement or any other reasonable business purpose (with respect to clause (ii) only, in the case of Seller, solely related to the Excluded Assets

38

or Excluded Liabilities, and in the case of Purchaser, solely related to the Purchased Assets or Assumed Liabilities) (but excluding in connection with any Legal Proceeding between Purchaser or any other member of Purchaser Group, on the one hand, and Seller or any of its Affiliates on the other hand); provided, however, that any such access by Seller or Purchaser, as applicable, shall not unreasonably interfere with the conduct of the business of Seller or Purchaser (including the Business), as applicable. Seller or Purchaser, as applicable, will hold, and will use cause their respective officers, directors or employees to hold, and use commercially reasonably efforts to cause their accountants, counsel, consultants, advisors and agents to hold, in confidence (in accordance with the terms of Section 5.98, as applicable), unless compelled to disclose by judicial or administrative process or by other requirements of Law, all confidential documents and information concerning Seller, Purchaser or the Business, as applicable, provided to them pursuant to this Section 6.5.

Section 6.6    SFO Bond.  Purchaser shall provide new bonds for the leases at San Francisco International Airport at its sole cost and expense.  The cash securing the bonds provided by Seller for such leases at San Francisco International Airport shall be returned to Seller.

Section 6.7    San Leandro Storage Facility Access. Seller and Purchaser shall enter into an agreement pursuant to which Purchaser shall have access to the San Leandro Storage Facility for a period of two (2) months after the Closing in exchange for payment of $25,000 per month.  Seller shall pay utilities and other costs associated with such facility.

Section 6.8    Receipt of Property Relating to Excluded Assets. If, following the Closing, Purchaser (or its Affiliates or Representatives) receives any money, check, note, draft, instrument, payment or other property as proceeds of the Excluded Assets or any part thereof, each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Seller and, up on receipt thereof, shall notify Seller in writing of such receipt and shall remit the same (or cause the same to be remitted) to Seller in the manner specified by Seller.

ARTICLE VII
TAX MATTERS

Section 7.1    Tax Cooperation. Each of Seller and Purchaser agrees to furnish or cause to be furnished to the other Party, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of any Tax returns (including any claim for a Tax refund) by Seller or Purchaser, the making of any election relating to Taxes by Seller or Purchaser, the determination of liability for Taxes, the preparation for any audit by any Governmental Authority, and the prosecution or defense of any Claim, suit or other Legal Proceeding relating to any Tax. Seller and its Affiliates shall (a) abide by all record retention agreements entered into with any Governmental Authority and (b) give Purchaser thirty (30) days' written notice prior to transferring, destroying or discarding any Tax records and, if Purchaser so requests, shall allow Purchaser to take possession of such Tax records. Seller and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other Legal Proceeding relating to Taxes involving the Purchased Assets or the Business. Notwithstanding anything to the contrary in this Agreement, Seller shall have the exclusive right to control in all respects at its sole cost and expense, and neither Purchaser nor any of its Affiliates shall be entitled to participate in, any Tax proceeding with respect to any Tax Return of Seller of any Affiliate thereof to the extent such Tax proceeding relates to Taxes paid or borne by Seller.

Section 7.2    Transfer Taxes. Any and all sales, use, transfer, recording or other similar taxes or charges assessed at Closing or at any time thereafter on the Transfer of any Purchased Assets at the Closing (collectively, the "Transfer Taxes") shall be paid equally by Purchaser and Seller.  Each Tax Return with respect to such Transfer Taxes will be prepared and filed by the Party that customarily has primary

39

responsibility for filing such Tax Return pursuant to applicable Law, and such Party shall bear the cost of such preparation and filing, but with the other Party contributing its 50% share of the applicable Transfer Tax to the filing Party. The Parties will each timely sign and deliver (or cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate (and will each otherwise cooperate) to establish any available exemption (or otherwise reduce) with respect to any such Taxes or fees. The Parties shall cooperate in good faith to minimize, to the fullest extent possible under applicable Law, the amount of any such Transfer Taxes.

Section 7.3    Asset Taxes. Seller shall be allocated and bear all property Taxes and similar ad valorem obligations (excluding, for the avoidance of doubt, income Taxes and Transfer Taxes) levied based upon or measured by the ownership or operation of the Purchased Assets and/or Business (collectively, the "Asset Taxes") for any period or portion thereof ending on or prior to the Closing Date ("Excluded Taxes") and Purchaser shall be allocated and bear all Asset Taxes for any period or portion thereof that begins after the Closing Date. For purposes of this Section 7.3, Asset Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated between the portion of such Straddle Period ending on the Closing Date and the portion of such Straddle Period beginning after the Closing Date by prorating each such Asset Tax based on the number of days in the applicable Straddle Period ending on and including the Closing Date, on the one hand, and the number of days in such Straddle Period after the Closing Date, on the other hand, and all other Asset Taxes (if any) shall be allocated upon a hypothetical closing of the taxable year on the Closing Date.

Section 7.4    Tax Returns. Seller shall timely file or cause to be timely filed when due all Tax Returns that are required to be filed on or prior to the Closing Date with respect to the Purchased Assets or the Business and, in each case, all such Tax Returns shall be prepared and filed in a manner consistent with past practice. In each case, Seller shall remit or cause to be remitted any Taxes shown as due on such Tax Returns. Purchaser shall timely file or cause to be timely filed when due (taking into account all extensions properly obtained) all other Tax Returns that are required to be filed with respect to the Purchased Assets or the Business after the Closing Date and shall pay any Taxes shown as due on such Tax Returns. Seller shall reimburse Purchaser for (A) all Excluded Taxes which are remitted in respect of any Tax Return to be filed by Purchaser pursuant to this Section 7.4 or (B) Excluded Taxes in respect of any Tax Return to be filed by Seller under this Section 7.4 which have not been paid by Seller and for which a taxing authority seeks payment from Purchaser, in each case, no later than ten (10) days after Purchaser's written request therefor.

ARTICLE VIII
EMPLOYEE MATTERS

Section 8.1    Employees and Offers of Employment. As of the Closing, Purchaser shall offer employment to those Business Employees that Purchaser selects in its sole discretion (collectively, the "Offered Employees"). Those Offered Employees who accept Purchaser's offer of employment and commence working for Purchaser on the Closing Date shall hereafter be referred to as "Transferred Employees." Seller shall reasonably cooperate with Purchaser to assist Purchaser in obtaining acceptance by the Offered Employees of the employment offers made by Purchaser.

Section 8.2    No Third Party Beneficiaries; No Guarantee of Employment. The Parties acknowledge and agree that all provisions contained in Sections 8.1 and 8.2 are included for the sole benefit of the Parties, and that nothing in this Agreement, whether express or implied, shall create any third party beneficiary or other rights (a) in any other Person, including any employee or former employee of Seller or its Affiliates (including the Business Employees), any participant in any employee benefit plan maintained by any of the Parties or any of their respective Affiliates, or any dependent or beneficiary thereof, or (b) to continued employment with any of the Parties or any of their respective Affiliates. Nothing in this Agreement shall affect the right of the Parties or any of their respective Affiliates to terminate the

40

employment of its employees.

ARTICLE IX

CLOSING CONDITIONS

Section 9.1     <u>Conditions to Obligations of Purchaser and Seller</u>. The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a)     the Sale Order shall have been entered by the Bankruptcy Court; and

(b)     no injunction, stay or similar Order issued by any Governmental Authority, or other legal restraint or prohibition, shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

Section 9.2     <u>Conditions to Obligations of Purchaser</u>. The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver (to the extent waivable) by Purchaser) of the following further conditions:

(a)     Seller shall have performed and complied in all material respects with all of the covenants, obligations and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date;

(b)     The representations and warranties of Seller herein shall be true and correct in all respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all respects as of such earlier date);

(c)     since the date of this Agreement, there shall not have occurred any Material Adverse Effect;

(d)     the Legal Proceeding involving International Fidelity Insurance Company and the Company with respect to the bonds issued as part of the lease of the storage facility located at San Francisco International Airport, Terminal 3 shall have been resolved in a manner satisfactory to Purchaser in it sole discretion;

(e)     the Sale Order shall be in form and substance acceptable to Purchaser in its sole discretion;

(f)     Seller shall have delivered all items and satisfied all obligations pursuant to <u>Section 2.8</u>; and

(g)     Seller shall have delivered the Novated Leases signed by Seller and the applicable landlords.

Section 9.3 <u>Conditions to Obligations of Seller</u>. The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver (to the extent waivable) by Seller) of the following further conditions:

(a)     Purchaser shall have performed and complied in all material respects with all of the covenants, obligations and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing Date;

(b)     the representations and warranties of Purchaser herein shall be true and correct in all respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all respects as of such earlier date);

(c)     Purchaser shall have delivered all items and satisfied all obligations pursuant to Section 2.9; and

(d)     the Bankruptcy Court shall have entered an Order (which may be the Sale Order) approving the execution of this Agreement by Seller and the consummation by Seller of the Transactions that is not subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

ARTICLE X
SURVIVAL; INDEMNIFICATION

Section 10.1     Survival. The representations, warranties, covenants and agreements in this Agreement shall survive the Closing for a period of twelve (12) months. Notwithstanding the foregoing, if, prior to the close of business on the last day a claim for indemnification may be asserted hereunder, Seller shall have been properly notified of a claim for indemnity hereunder and such claim shall not have been finally resolved or disposed of at such date, such claim shall continue to survive and shall remain a basis for indemnity hereunder until such claim is finally resolved or disposed of in accordance with the terms hereof.

Section 10.2     Indemnification. From and after the Closing,  Purchaser and its Affiliates (the "Indemnified Parties") shall be entitled to indemnification, to be held harmless, and to reimbursement solely from the Withheld Amount from, against and in respect of, any and all claims, liabilities, obligations, damages, losses, costs, expenses, penalties, fines and judgments (at equity or at law, including statutory and common) and damages whenever arising or incurred (including amounts paid in settlement, costs of investigation, and reasonable attorneys' fees and expenses) arising out of or relating to:

(a) any liability or obligation of Seller of any nature whatsoever except the Assumed Liabilities;

(b) any breach or inaccuracy of any representation or warranty made by Seller in this Agreement or any certificate delivered by Seller hereunder (for purposes of this Section 10.2(b), each such representation and warranty shall be read without reference to materiality or Material Adverse Effect or similar language);

(c) any breach of any covenant, agreement or undertaking made by Seller in this Agreement; or

[((d) any matter set forth on Exhibit 10.2(d).].).

The claims, liabilities, obligations, losses, damages, costs, expenses, penalties, fines and judgments of the Indemnified Parties described in this Section 10.2 as to which Indemnified Parties are entitled to indemnification are collectively referred to as "Purchaser Losses." The provisions for indemnity contained in Section 10.2(b) shall become effective only in the event that the aggregate amount of all Purchaser Losses under this Article X exceeds Thirty Thousand Dollars ($30,000) (the "Seller Basket"), in which event Indemnified Parties shall be entitled to such Purchaser Losses in excess of Seller Basket; provided, however, that claims for indemnification from and against Purchaser Losses relating to any inaccuracy or

42

breach of the Fundamental Representations made by Seller or based on fraud shall not be subject to Seller Basket.

The respective representations and warranties of Seller contained in this Agreement or any certificate or other document delivered by Seller at or prior to the Closing and the rights to indemnification set forth in this Article X shall not be deemed waived or otherwise affected by any investigation made, or knowledge acquired, by or on behalf of Purchaser.

In the event an Indemnified Party claims a right to indemnification pursuant hereto, such Indemnified Party shall send written notice of such claim to Seller (a "Notice of Claim"). Such Notice of Claim shall specify the basis for such claim. The failure by any Indemnified Party to notify Seller shall not reduce the rights of the Indemnified Party with respect to any claim made pursuant to this Article X, it being understood that notices for claims against the Withheld Amount must be delivered prior to the expiration of the survival period.  If the claim relates to a third-party claim, the Indemnified Party shall control the defense of the claim.  For the avoidance of any doubt, the cost of such defense shall be included as Purchaser Losses.  In the event Seller does not notify the Indemnified Party within thirty (30) days following its receipt of such notice that Seller disputes the claim by the Indemnified Party under this Article X or the amount thereof, the claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed Purchaser Losses under this Article X with respect to which the Indemnified Party shall be entitled to set off such Purchaser Losses from the Withheld Amount.  In the event Seller has timely disputed Purchaser Losses with respect to such claim as provided above, as promptly as possible, such Indemnified Party and Seller shall establish the merits and amount of such claim (by mutual agreement, litigation, arbitration or otherwise) and, within five (5) Business Days following the final determination of the merits and amount of such claim, the Indemnified Party shall be entitled to set off such Purchaser Losses from the Withheld Amount to the extent consistent with such final determination.

Section 10.3    Withheld Amount Payment. Within three (3) Business Days after the date that is (i) six (6) months after the Closing Date, Purchaser will pay to Seller an amount equal to one half the Withheld Amount (i.e., $325,000) minus the amount of all Claims made pursuant to this Article X that have been finally resolved or that are then pending, and (ii) twelve (12) months after the Closing Date, Purchaser will pay to Seller an amount equal to the balance of the Withheld Amount, if any, minus the amount of all Claims made pursuant to this Article X that have been finally resolved or that are then pending.


ARTICLE XI
TERMINATION

Section 11.1    Grounds for Termination. This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of Seller and Purchaser;

(b)    by Seller or Purchaser, if the Closing shall not have been consummated on or before [December 31], 2025 (the "End Date"), unless the Party seeking termination is in material breach of any of its representations, warranties, covenants or agreements contained herein; provided, however, that, at Purchaser's sole election (on one occasion) by providing written notice to Seller on or prior to [December 31], 2025, the End Date shall be extended by an additional sixty (60) day period;

(c)    by Seller, if

43

(i)  a breach or failure to perform any of the covenants, obligations or agreements of Purchaser contained in this Agreement shall have occurred, or there shall be any inaccuracy of any of the representations or warranties of Purchaser contained in this Agreement, and such breach, failure to perform or inaccuracy, either individually or in the aggregate would, if occurring or continuing on the Closing Date, give rise to a failure of a condition set forth in <u>Section 9.3</u> and, to the extent curable, such breach, failure to perform or inaccuracy has not been cured or waived within thirty (30) days following receipt of written notice from Seller specifying, in reasonable detail, such claimed breach, failure to perform or inaccuracy and demanding its cure or satisfaction; <u>provided</u>, <u>however</u> that Seller shall not have the right to terminate this Agreement pursuant to this <u>Section 11.1(c)</u>, if Seller is then in breach of, or has failed to perform, any of its covenants, obligations or agreements contained in this Agreement or any of the representations or warranties of Seller contained in this Agreement shall be inaccurate, and such breach, failure to perform or inaccuracy would give rise to the failure of a condition set forth in <u>Section 9.2</u>; or

(ii)  (A) all of the conditions in <u>Section 9.1</u> and <u>Section 9.2</u> (other than those conditions that by their nature are to be satisfied on the Closing Date) have been satisfied or waived, but subject to such conditions being reasonably capable of being satisfied at the Closing), (B) Seller has delivered to Purchaser an irrevocable commitment in writing that the conditions set forth in <u>Section 9.3</u> have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing Date, but subject to such conditions being reasonably capable of being satisfied or waived at the Closing) and that Seller is ready, willing and able to consummate the Closing, and (C) Purchaser has failed to consummate the Closing on the date the Closing should have occurred pursuant to <u>Section 2.7</u>;

(d)  by Purchaser, if a breach or failure to perform any of the covenants, obligations or agreements of Seller contained in this Agreement shall have occurred, or there shall be any inaccuracy of any of the representations or warranties of Seller contained in this Agreement, and such breach, failure to perform or inaccuracy, either individually or in the aggregate would, if occurring or continuing on the Closing Date, give rise to a failure of a condition set forth in <u>Section 9.2</u> and, to the extent curable, such breach, failure to perform or inaccuracy has not been cured or waived within thirty (30) days following receipt of written notice from Purchaser specifying, in reasonable detail, such claimed breach, failure to perform or inaccuracy and demanding its cure or satisfaction; <u>provided</u>, <u>however</u> that Purchaser shall not have the right to terminate this Agreement pursuant to this <u>Section 11.1(d)</u> if Purchaser is then in breach of, or has failed to perform, any of its covenants, obligations or agreements contained in this Agreement or any of the representations or warranties of Purchaser contained in this Agreement shall be inaccurate, and such breach, failure to perform or inaccuracy would give rise to the failure of a condition set forth in <u>Section 9.3</u>;

(e)  by Purchaser if Seller has not filed a motion seeking approval of the Sale Order on or before September 26, 2025;

(f)  by Seller or Purchaser if there shall be in effect a final non-appealable Order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions, it being agreed that the Parties shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence);

(g)  by Purchaser, if, as a result of an Order of the Bankruptcy Court, (i) the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code, (ii) a chapter 11

44

trustee is appointed with respect to Seller, (iii) a trustee is appointed in the Bankruptcy Case or (iv) an examiner is appointed in the Bankruptcy Case with expanded powers related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(h) by Purchaser, if Seller (i) withdraws, or seeks to withdraw, the Sale Motion, or (ii) announces or files a plan or other transaction, or seeks to file a plan or other transaction, contemplating reorganization or sale of all or any part of Seller under the Bankruptcy Code that does not comply with the terms and conditions of this Agreement.

(i) by Purchaser if the Bankruptcy Court does not enter the Bid Procedures Order or approve the Break Up Fee before any overbidding is permitted.

The Party desiring to terminate this Agreement pursuant to this Section 11.1 (other than pursuant to Section 11.1(a)) shall give notice of such termination to the other Party in accordance with Section 12.1.

Section 11.2    Effect of Termination.

(a) If this Agreement is terminated as permitted by Section 11.1, such termination shall be without liability of any Party (or any stockholder, director, officer, employee, agent, consultant or Representative of such Party) to the other Party to this Agreement except, subject to Section 2.11, any liability of a Party for any intentional and willful breach of this Agreement by such Person occurring prior to such termination. In determining losses or damages recoverable upon termination prior to the Closing by a Party for the other Party's intentional and willful breach, the Parties acknowledge and agree that, subject to Section 2.11, such losses and damages shall not be limited to reimbursement of expenses or out-of-pocket costs, and shall include the benefit of the bargain lost by such Party. The provisions of Sections 10.2, 11.2, 12.2, 12.3, 12.5, 12.6, 12.7, 12.8, 12.11, 12.12, 12.13 and 12.17 shall survive any termination hereof pursuant to Section 11.1.

(b) For the avoidance of doubt, notwithstanding anything contained in this Agreement to the contrary, in all cases Purchaser's Liability to Seller (including for intentional and willful breach) under or arising from this Agreement is and shall be limited to recovery of the Deposit from the Escrow Account subject to and in accordance with the terms of the Escrow Agreement and Section 2.11.

ARTICLE XII
MISCELLANEOUS

Section 12.1    Notices. All notices, requests, demands, claims and other communications hereunder (each, a "Notice") given pursuant to this Agreement will be in writing. Any Notice shall be sent (a) by personal delivery to the recipient, (b) to the recipient by reputable overnight courier services (charges prepaid), or (c) by facsimile transmission or electronic mail (which, in the case of this clause (c), also shall be sent contemporaneously by another method specified above in this Section 12.1, if receipt is not confirmed), in each case addressed to the intended recipient as set forth below:

if to Purchaser, to:

45

Barnes & Noble, Inc.
33 East 17th Street, New York, NY 10003

Attention: SVP & General Counsel
Email: lal Counsel
Email: legalnotices@bn.com

with copies to (which shall not constitute notice):

Potomac Law Group, PLLC
1717 Pennsylvania Avenue, NW, Suite 1025
Washington, D.C. 20006

Attention: Greg Giammittorio
E-mail: ggiammittorio@potomaclaw.com

if to Seller, to:

Books, Inc.
3030 Catalina Drive
Davis, CA 95616

Attention: Andy Perham, CEO and Plan Administrator
Email: andy.perham@gmail.com

with copies to (which shall not constitute notice):

Finestone Hayes LLP
456 Montgomery St., Ste. 1300
San Francisco, CA  94104

Attention: Stephen Finestone
Email: sfinestone@fhlawllp.com

A Party may change its address for receipt of Notices by Notice given to the other Parties in accordance with this Section 12.1. Each Notice sent in accordance with this Section 12.1 shall be deemed given and effective upon receipt or refusal of receipt.

Section 12.2    Expenses.  Except as otherwise provided in this Agreement, each party hereto shall be responsible for the payment of its own attorneys', brokers' and other costs, fees and expenses incurred in connection with the Transactions.

Section 12.3    Waivers. No failure or delay by any party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative.

Section 12.4    Successors and Assigns. The provisions of this Agreement shall be binding

46

upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that no party hereto may assign, delegate or otherwise Transfer any of its rights or obligations under this Agreement without the written consent of the other parties hereto. Notwithstanding the foregoing or anything in this Agreement to the contrary, Purchaser may assign this Agreement and/or any of its rights, interests, or obligations hereunder (in whole or in part) to an Affiliate of Purchaser without the prior written consent of any other party hereto; provided, that such assignment shall not relieve Purchaser of its obligations hereunder. In furtherance of the foregoing, Purchaser may, without the consent of Seller or any other party hereto, designate, in accordance with the terms of this paragraph and effective as of the Closing, one (1) or more Persons to acquire all, or any portion of, the Purchased Assets and assume all or any portion of the Assumed Liabilities or pay all or any portion of the Purchase Price (a "Designated Purchaser"); provided, that such assignment shall not relieve Purchaser of its obligations hereunder. The above designation may be made by Purchaser by written notice to Seller at any time prior to the Closing Date. The Parties agree to modify any Closing deliverables in accordance with the foregoing designation.

Section 12.5    Governing Law. This Agreement and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement as an inducement to enter this Agreement) shall be governed by and construed in accordance with the internal Laws of the State of California and any applicable provisions of the Bankruptcy Code, without giving effect to any choice or conflict of Law (whether of the State of California or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of California and any applicable provisions of the Bankruptcy Code.

Section 12.6    Jurisdiction.

(a)    Prior to the closing of the Bankruptcy Case pursuant to Section 350 of the Bankruptcy Code, the Parties agree that any Legal Proceeding seeking to enforce or interpret any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such Legal Proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such Legal Proceeding in the Bankruptcy Court or that any such Legal Proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such Legal Proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 12.1 shall be deemed effective service of process on such Party.

(b)    After the closing of the Bankruptcy Case pursuant to Section 350 of the Bankruptcy Code, except as otherwise expressly provided in this Agreement, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the state and federal courts within the State of California and any appellate court from any thereof, for the resolution of any Legal Proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions. The Parties hereby irrevocably waive, to the fullest extent permitted by Law, any objection that they may now or hereafter have to the laying of the venue of any such Legal Proceeding in any such court or that any such Legal Proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such Legal Proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of

process on such Party as provided in <u>Section 12.1</u> shall be deemed effective service of process on such Party.

Section 12.7 <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

Section 12.8 <u>Specific Performance</u>. Subject to <u>Section 2.11</u> and <u>Section 11.2(b)</u>, the Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached or the Closing was not consummated, and that money damages would not be an adequate remedy, even if available. Subject to <u>Section 2.11</u> and <u>Section 11.2(b)</u>, it is accordingly agreed that the Parties shall be entitled to an injunction or injunctions, or any other appropriate form of specific performance or equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (including the parties' obligations to consummate the Closing) in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law, or in equity, or otherwise. Subject to <u>Section 2.11</u> and <u>Section 11.2(b)</u>, each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to post any bond or other security in connection with any such Order. Notwithstanding anything to the contrary contained in this <u>Section 12.8</u> or elsewhere in this Agreement or any other Transaction Document, Seller acknowledges and agrees that the recovery of the Deposit from the Escrow Account in accordance with the terms of the Escrow Agreement and <u>Section 2.11</u> will be Seller's sole and exclusive remedy for any and all damages that any of them may suffer as a result of any Purchaser Default Termination or any other failure by Purchaser to consummate the transactions contemplated hereby (including in respect of any intentional or willful breach hereof).

Section 12.9 <u>No Third Party Beneficiaries</u>. No provision of this Agreement is intended to confer upon any Person other than the Parties any rights or remedies hereunder.

Section 12.10 <u>Entire Agreement; Amendments; Counterparts</u>. This Agreement (including the Disclosure Schedules, Schedules and Exhibits hereto), together with the other Transaction Documents, set forth the entire agreement among the parties hereto with respect to the subject matter hereof, merge all prior negotiations, agreements and understandings, if any, and state in full all representations, warranties, covenants, obligations and agreements which have induced this Agreement. This Agreement can be amended, supplemented or changed only by a written instrument making specific reference to this Agreement executed by Purchaser and Seller. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signed .pdf or other electronic copies of this Agreement shall legally bind the Parties to the same extent as original documents. This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party.

Section 12.11 <u>Headings</u>. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

Section 12.12 <u>Severability</u>. If any one (1) or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by Law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

48

Section 12.13    Negotiated Agreement. Each party hereto acknowledges that it has been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any party because such party or its Representatives drafted such provision.

Section 12.14    Interpretation. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    All references in this Agreement to Articles, Sections, Disclosure Schedules, Schedules and Exhibits shall be deemed to refer to Articles, Sections, Disclosure Schedules, Schedules and Exhibits to this Agreement.

(b)    The Disclosure Schedules and all Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(d)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action will be extended to the next succeeding Business Day.

(f)    Any reference in this Agreement to $ shall mean U.S. dollars.

(g)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(h)    The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(i)    An item shall be considered "made available" (or words of similar import) to Purchaser only if such item has been made available for viewing by Purchaser and its Representatives in the electronic data room established by Seller, which is hosted by DropBox, in connection with the Transactions at least five (5) calendar days prior to the date of this Agreement.

Section 12.15    Bulk Sales. Purchaser hereby waives compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Purchaser. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and

49

clear of any security interests in the Purchased Assets, including any liens or claims arising out of the bulk transfer laws, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

        Section 12.16  <u>Non-Recourse</u>. All claims or causes of action (whether in contract or in tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the other Transaction Documents, or the negotiation, execution or performance of this Agreement or any other Transaction Documents (including any representation or warranty made in or in connection with this Agreement or any other Transaction Document or as an inducement to enter into this Agreement or any other Transaction Document), may be made only against the Persons that are expressly identified as parties hereto. No Person who is not a named party to this Agreement, including any past, present or future direct or indirect director, officer, employee, incorporator, member, manager, partner, equityholder, creditor, Affiliate, agent, attorney or other representative of any named party to this Agreement or any of their Affiliates (such Persons, collectively, "Non- Party Affiliates"), shall have any liability (whether in contract or in tort or otherwise, or based upon any theory that seeks to impose liability of an entity party against its owners or Affiliates) for any obligations or liabilities arising under, in connection with or related to this Agreement, any other Transaction Document or for any claim based on, in respect of, or by reason of this Agreement, any other Transaction Document or the negotiation or execution hereof, and each party hereto waives and releases all such liabilities, claims and obligations against any such Non-Party Affiliates.

*[signature page follows]*

50

4998-6398-5148, v. 17

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**Purchaser**:

**BI Acquisition Co. LLC**

By:_____

Name:

Title:

**Seller**:

**Books, Inc.**

By:_____

Name:

Title:

4908-6398-1143, v. 18

## Schedule A

### Leased Real Property that Requires Novation

- Opera Plaza – 601 Van Ness Ave, San Francisco, CA 94102
- Laurel Village – 3515 California St, San, Francisco, CA 94118
- Marina – 2251 Chestnut St, San Francisco 94123
- Alameda – 1344 Park St, Alameda, San Francisco, CA 94501
- Campbell – 1875 S. Bascom Ave. Suite 600, Campbell, CA 95008
- Mountain View – 317 Castro St, Mountain View, CA 94041
- Palo Alto – 74 Town & Country Village, Palo Alto, CA 94301
- Books Inc. Terminal 2 – San Francisco International Airport, CA

### Leased Real Property that will be Assumed

- Compass Books Terminal 3 – San Francisco International Airport, CA
- Storage facility also located at San Francisco International Airport, CA

**Purchased Contracts**

**Schedule 2.1(a)(i) – Assumed Contracts**

[None.].

**Schedule 2.1(a)(ii) – Assumed Leases**

1.  Lease dated December 22, 2008, as amended, between Seller and Rodney S. Mills Generation Skipping Trust Leslie K. Mills Generation Skipping Trust dated December 22nd, 2008, dba Mills Properties and Seller for the premises at 317 Castro Street, Mountain View, California.

2.  L15-0085 T3E Bookstore Lease, dated September 9, 2015, as amended, between Seller and City and County of San Francisco, acting by and through its Airport Commission for the premises at SFO Terminal 3.

3.  L20-0049 T2 Bookstore Lease, dated October 19, 2020, as amended, between City and County of San Francisco, acting by and through its Airport Commission for the premises at SFO Terminal 2.

4.  Nonairline Terminal Space or Use Permit, dated February 6, 2025, between City and County of San Francisco, acting by and through its Airport Commission for the premises at SFO.

5.  Lease dated July 12, 2004, as amended, between Seller and Park Street Properties I, LLC for the premises at 1344-46 Park Street, Alameda, California.

6.  Lease, dated January 23, 1995, as amended, between Seller and Angele Bonura Rice Trust and Jeff J. Brucia, Ric A. Brucia and Kristina A. Davis, as successors to Brucia Family Trust for the premises at 2251 Chestnut St., San Francisco, California.

7.  Lease, dated October 1, 2006, as amended, between Seller and Opera Plaza LP for the premises at 601 Van Ness Ave, San Francisco, California.

8.  Lease, dated June 10, 1991, as amended, between Seller and Bi-Skan, Ltd. for the premises at 3515 California St., San Franciso, California.

9.  Lease, dated February 22, 2017, as amended, between Seller and Pruneyard Regency, LLC l for the premises at 1875 South Bascom Ave., Ste. 600, Campbell, California.

10. Lease, dated July 20, 2007, as amended, between Seller and CEP Town & Country Investors LLC for the premises at Town and Country Village 855 El Camino Real, Suite #74, Palo Alto, California.

**Schedule 3.13(i)**

**Certain Purchased Contracts with Cure Costs**

| Purchased Contract | Cure Cost |
|---|---|
| Lease dated December 22, 2008, as amended, between Seller and Rodney S. Mills Generation Skipping Trust Leslie K. Mills Generation Skipping Trust dated December 22nd, 2008, dba Mills Properties and Seller for the premises at 317 Castro Street, Mountain View, California | $15,298.18 |
| Lease, dated January 23, 1995, as amended, between Seller and Angele Bonura Rice Trust and Jeff J. Brucia, Ric A. Brucia and Kristina A. Davis, as successors to Brucia Family Trust for the premises at 2251 Chestnut St., San Francisco, California | $22,064.21 |
| Lease, dated June 10, 1991, as amended, between Seller and Bi-Skan, Ltd. for the premises at 3515 California St., San Franciso, California | $19,400.00 |
| Lease, dated February 22, 2017, as amended, between Seller and Pruneyard Regency, LLC l for the premises at 1875 South Bascom Ave., Ste. 600, Campbell, California | $25,700.00 |

**Schedule 2.6(c)**

**Inventory Valuation Methodology**

Purchaser will engage its third-party physical inventory provider to conduct physical inventories at each of the Leased Real Properties. The inventory will be counted, and the corresponding extended retail values will be compiled. Purchaser shall use it existing product hierarchy to assign an extended cost value based on markup history by specific department and subject.